**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BOSS STUDIO LLC, a Wyoming LLC; and REHAAB HAQUE, an individual,<br><br>                Plaintiffs,<br><br>      -against-<br><br>VLADISLAV POPOV, an individual; and ANDREI ACUÑA, an individual,<br><br>            Defendants. | Case No.: 1:26-cv-04323-GBD<br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY** |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND.............................................................................................. 1

    I.    Haque's contributions improve the Game. ......................................................... 1

    II.   Defendants expelled Haque and continued exploiting his works. ..................... 2

    III.  Since the litigation began, defendants have threatened the future of the Game. ............... 3

LEGAL STANDARD........................................................................................................ 4

ARGUMENT .................................................................................................................... 5

    I.    All four injunctive relief factors favor a temporary restraining order and a preliminary injunction. ...................................................................................... 5

        A.     Plaintiffs are likely to succeed on the merits. ...........................................5

            1.    Defendants' ongoing use of protected works constitutes copyright infringement. ................................................................ 5

            2.    Defendants have breached their fiduciary duty of loyalty to Haque. ........... 7

            3.    Defendants have converted Haque's revenue share. ................................. 9

        B.     Plaintiffs will suffer irreparable harm absent temporary and preliminary injunctive relief. ................................................................11

        C.     The balance of equities favors plaintiffs. ...............................................13

        D.     The public interest supports granting the requested relief. ....................14

    II.   The temporary restraining order should issue without notice.......................... 14

        A.     FRCP 65, not the Hague Convention, governs notice requirement. ......14

        B.     The temporary restraining order should issue without notice..............15

    III.  No bond or only a nominal bond should be required.......................................... 17

    IV.  Expedited discovery is necessary for the preliminary injunction hearing. ....... 18

CONCLUSION................................................................................................................ 20

CERTIFICATE OF COMPLIANCE WITH L.R. 7.1(c).................................................. 1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAAG-California, LLC v. Kisana*,
    439 F. Supp. 3d 1265 (D. Utah 2020).......................................................................................11

*Ayyash v. Bank Al-Madina*,
    233 F.R.D. 325 (S.D.N.Y. 2005) ........................................................................................18, 19

*Birnbaum v. Birnbaum*,
    73 N.Y.2d 461, 539 N.E.2d 574 (1989)....................................................................................8

*Brenntag Int'l Chems., Inc. v. Bank of India*,
    175 F.3d 245 (2d Cir. 1999)....................................................................................................11

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,
    373 F.3d 296 (2d Cir. 2004)......................................................................................................8

*CCA & B, LLC v. Anhui Subang Energy Conservation Tech. Co.*,
    No. 1:23-CV-178-TWT, 2023 WL 3627885 (N.D. Ga. Feb. 3, 2023) ....................................16

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)........................................................................................................4

*Colavito v. New York Organ Donor Network, Inc.*,
    8 N.Y.3d 43, 860 N.E.2d 713 (2006).........................................................................................9

*Coley v. Vannguard Urb. Improvement Ass'n, Inc.*,
    No. 12-CV-5565 (PKC) (RER), 2016 WL 7217641 (E.D.N.Y. Dec. 13, 2016) .......................6

*Craig v. UMG Recordings, Inc.*,
    380 F. Supp. 3d 324 (S.D.N.Y. 2019)........................................................................................5

*Doctor's Assocs., Inc. v. Stuart*,
    85 F.3d 975 (2d Cir. 1996).......................................................................................................17

*Eastman Kodak Co. v. Collins Ink Corp.*,
    821 F. Supp. 2d 582 (W.D.N.Y. 2011) ....................................................................................18

*ECIMOS, LLC v. Carrier Corp.*,
    971 F.3d 616 (6th Cir. 2020) .....................................................................................................5

*F.T.C. v. Verity Int'l, Ltd.*,
    124 F. Supp. 2d 193 (S.D.N.Y. 2000)......................................................................................16

*Fox Corp. v. Media Deportes Mexico, S. de R.L. de C.V.*,
820 F. Supp. 3d 299 (S.D.N.Y. 2026)..................................................................................15

*Gelfand v. Stone*,
727 F. Supp. 98 (S.D.N.Y. 1989) .......................................................................................11

*Gibbs v. Breed, Abbott*,
271 A.D.2d 180, 710 N.Y.S.2d 578 (N.Y. App. Div. 2000) ..................................................8

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Loc. No.
70*,
415 U.S. 423 (1974)......................................................................................................16, 17

*Hayward Indus., Inc. v. Ningbo C.F. Elec. Tech Co., LTD.*,
No. 320CV00710MOCSCR, 2024 WL 1587024 (W.D.N.C. Apr. 11, 2024) .........................16

*Kidz Cloz, Inc. v. Officially For Kids, Inc.*,
320 F. Supp. 2d 164 (S.D.N.Y. 2004)....................................................................................7

*Leadenhall Cap. Partners LLP v. Advantage Cap. Holdings LLC*,
171 F.4th 155 (2d Cir. 2026) ................................................................................................5

*Linseth v. Sustayta*,
No. 1:21-CV-173, 2022 WL 2829740 (D.N.D. June 8, 2022) ...............................................11

*LoPresti v. Terwilliger*,
126 F.3d 34 (2d Cir. 1997).............................................................................................9, 10

*MacDonnell v. Buffalo Loan, Tr. & Safe Deposit Co.*,
193 N.Y. 92, 85 N.E. 801 (1908)...........................................................................................9

*Meinhard v. Salmon*,
249 N.Y. 458, 164 N.E. 545 (1928)........................................................................................7

*Merch. v. Lymon*,
No. 87CIV.7199(BDP)(NRB), 1995 WL 217508 (S.D.N.Y. Apr. 11, 1995) ...........................6

*In re Meridian Funds Grp. Sec. & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
917 F. Supp. 2d 231 (S.D.N.Y. 2013)....................................................................................9

*Peters Griffin Woodward, Inc. v. WCSC, Inc.*,
88 A.D.2d 883, 452 N.Y.S.2d 599 (1982) ..............................................................................9

*In re Platinum Partners Value Arbitrage Fund L.P.*,
No. 18CV5176 (DLC), 2018 WL 3207119 (S.D.N.Y. June 29, 2018) ....................................4

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)................................................................................................13

*Republic of Philippines v. Marcos*,
  806 F.2d 344 (2d Cir. 1986)........................................................................................11, 12

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
  754 F. Supp. 2d 616 (S.D.N.Y. 2010).................................................................................14

*Schneidman v. Tollman*,
  190 A.D.2d 524, 593 N.Y.S.2d 23 (1993) ............................................................................9

*U2 Home Ent., Inc. v. Bowery Music City, Inc.*,
  No. 03 CIV. 8909 (RJH), 2003 WL 22889738 (S.D.N.Y. Dec. 8, 2003)...............................16

*United States Sec. & Exch. Comm'n v. Collector's Coffee Inc.*,
  602 F. Supp. 3d 488 (S.D.N.Y. 2022)...................................................................................6

*United States v. Keyspan Corp.*,
  763 F. Supp. 2d 633 (S.D.N.Y. 2011)...................................................................................6

*In re Vuitton et Fils S.A.*,
  606 F.2d 1 (2d Cir. 1979) (per curiam).................................................................15, 16, 17

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) ...............................................................11

*XYZ Corp. v. Individuals, Corps., Ltd. Liab. Cos., P'ships, & Unincorporated
  Ass'ns Identified on Schedule A*,
  No. 24-CV-4428 (LLS), 2024 WL 3718106 (S.D.N.Y. Aug. 6, 2024) ...................................16

*Yador v. Mowatt*,
  No. 19-CV-4128(EK)(RML), 2021 WL 4502442 (E.D.N.Y. Sept. 30, 2021) .........................8

*Yurman Design, Inc. v. PAJ, Inc.*,
  262 F.3d 101 (2d Cir. 2001).............................................................................................5, 6

**Statutes**

17 U.S.C. §§ 106 and 501 ......................................................................................................6

17 U.S.C. § 410(c) ..................................................................................................................6

17 U.S.C. § 504........................................................................................................................5

**Other Authorities**

Fed. R. Civ. P. 26 ..............................................................................................................18, 20

Fed. R. Civ. P. 45 ....................................................................................................................20

Fed. R. Civ. P. 65 ........................................................................................................4, 14, 15, 17

Hague Convention. *Convention on the Service Abroad of Judicial and*
*Extrajudicial Documents in Civil or Commercial Matters*..................................................14, 15

Local Rule 6.1(d) ....................................................................................................................15

**INTRODUCTION**

Rehaab Haque is the co-owner of *Anime Vanguards* (the "Game"), a top-ranked Roblox game, who was unlawfully stripped of all compensation and control by his partners Vladislav Popov and Andrei Acuña.  Both Popov and Acuña live abroad, and are thus diverting Haque's share of the Game's revenue outside of the country and outside plaintiffs' reach.  To make matters worse, defendants have made many drastic changes to the Game to generate a short-term profit in exchange for the long-term sustainability of the Game, thereby allowing them to funnel a bulk of the funds outside the country.  Plaintiffs now face the prospect of prevailing at trial and collecting nothing.

Each month that passes without relief is a month that hundreds of thousands of dollars in revenue flows to Sweden and the Philippines.  Plaintiffs request a narrow and targeted order to protect their equitable interests by preserving limited funds—about two-thirds of the Game's revenue last year—in defendants' Roblox accounts until this litigation is resolved.

**FACTUAL BACKGROUND**

*Anime Vanguards* is a Roblox tower-defense game that has been "favorited" by more than 1.8 million players and visited by over 1.8 billion users.  (Compl. ¶ 13.)  It is the top-ranked game in its genre on the platform.  (*Id*. ¶ 23.)  These results trace directly to the work of plaintiff Rehaab Haque.

**I.    Haque's contributions improve the Game.**

Haque was engaged by defendants on September 9, 2024 to help program *Anime Vanguards*.  (Decl. of Rehaab Haque ("Haque Decl.") ¶ 3) When he joined the project, the Game had dropped from 340,000 concurrent users to fewer than 5,000 over the course of three months, which threatened the Game's survival.  (*Id*.)  Haque stepped in, put in extra hours, and turned things around.  (*Id*. ¶¶ 4, 8, 10.)

His contributions were substantial and original.  (*Id*. ¶¶ 4-6).  Haque created more than 50 core systems and mechanics, over 130 visual effects for game units, the code for over 270 visual effects, mechanics for more than 40 units, and visual effects for more than 10 in-game cutscenes. (*Id.* ¶ 4; *see also* Compl. ¶ 19.)  Haque holds registered copyrights in his source code (U.S. Copyright Reg. TXu 2-541-660) and audiovisual contributions (U.S. Copyright Reg. PA 2-584-333) (collectively, the "Protected Works").  (Haque Decl. ¶ 6.)

In recognition of Haque's work, defendants made him a co-owner and partner with a 20% revenue share on December 13, 2024.  (*Id*. ¶ 7.)  Under his leadership, the Game returned to more than 100,000 concurrent users and generated over $12 million in 2025.  (*Id*. ¶ 10.)

## II.    Defendants expelled Haque and continued exploiting his works.

When the Game experienced a subsequent performance decline, Popov blamed Haque publicly.  (*Id*. ¶ 13, 33-34.)  On December 11, 2025, Popov stated publicly in a Discord chat[1] that he would quit unless Haque reduced his ownership from 20% to 10%.  (*Id*. ¶ 13)  In this Discord chat, Popov accused Haque of misconduct and invoked graphic claims of self-harm.  (*Id*.)  Trapped by these threats, Haque agreed to the reduction in exchange for a reduction in Haque's responsibilities.  (*Id*.)  The promised reduction in responsibilities never occurred.  (*Id*.)

Just a few weeks later, defendants removed Haque from the Roblox group entirely, stripped him of all ownership Discord channels, eliminated his management role, and set his group-payout allocation to zero.  (*Id*. ¶ 14.)  Defendants gave no notice and paid him nothing. (*Id*.)

---

[1] Discord is a popular messaging software.  Users can directly message one another, or start group chats with many users.

Since removing Haque, defendants have continued to operate *Anime Vanguards* daily. (*Id.* ¶ 17.)  That operation necessarily reproduces, distributes, publicly displays, and incorporates derivative versions of the Protected Works—including Haque's source code and visual effects—that remain embedded in the Game's architecture.  (*Id.*)  Haque never designated those works as "works made for hire," and he has never granted defendants any license to use the Protected Works without compensation.  (*Id.* ¶ 5.)

Defendants are not United States residents.  Popov resides in Sweden and Acuña resides in the Philippines.  (Compl. ¶¶ 5–6.)  Neither defendant is known to maintain substantial domestic assets.  The revenue generated by *Anime Vanguards* flows through the Roblox group-payout system and is subject exclusively to defendants' control.  (Haque Decl. ¶ 39.)  With each passing day, then, defendants direct revenue that rightfully belongs to Haque—and stems from his protected copyrights—out of the country.

### III.    Since the litigation began, defendants have threatened the future of the Game.

Since the complaint was filed, defendants have made drastic changes to the Game that boost short-term profit in exchange for longevity, thereby allowing them to divert as much revenue as they can into their foreign accounts.

First, shortly after the complaint was filed, defendants freely a heavily monetized in-game currency that players would otherwise purchase.  (Haque Decl. ¶ 22.)  Distributing large volumes of this currency for free—rather than selling it—produces a short-term engagement spike followed by a permanent collapse of a primary revenue stream.  (*Id.* ¶ 23.)  Second, on the same day, defendants removed the models for the rarest units in the Game, alienating the most engaged and highest-spending players.  (*Id.* ¶ 28.)  Third, defendants added the "Memorias" system after ejecting Haque from the Game, which boosts the pay-to-win nature of the Game, thereby eroding long-term goodwill.  (*Id.*. ¶¶ 29-32.)

3

Plaintiff Boss Studio LLC—operator of *Anime Last Stand*, the primary competitor to *Anime Vanguards* during 2025—adopted a substantially similar monetization strategy during its operation of *Anime Last Stand*.  (Decl. of Brandon Ha ("Ha Decl.") ¶¶ 4, 5, 7.)  Boss increased the amount of premium currency obtainable through free gameplay, producing an initial engagement surge.  (*Id.* ¶¶ 7, 8.)  Within weeks, player retention deteriorated significantly and the Game lost tens of thousands of active players.  (*Id.* ¶¶ 9, 10.)  *Anime Vanguards* is following the same trajectory, with increasingly volatile player counts and lower pre-update engagement figures.  (Haque Decl. ¶ 38.)

These changes to the Game are consistent with prior conduct.  At a prior low point in the Game, defendant Acuña stated that he intended to sell the Game the moment its next update shipped, stating: "after [update] 2 comes out im selling the game."  (*Id.*  ¶¶ 33, 39,)

## LEGAL STANDARD

A temporary restraining order and a preliminary injunction require the same showing under FRCP 65.  A movant must demonstrate: (1) "that he is likely to succeed on the merits, (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008)).  These factors are applied on a sliding scale, so that greater strength on one may compensate for a lesser showing on another.  *In re Platinum Partners Value Arbitrage Fund L.P.*, No. 18CV5176 (DLC), 2018 WL 3207119, at *3 n.4 (S.D.N.Y. June 29, 2018) (citing *Citigroup Glob. Markets*, 598 F.3d, 37-38 n.8).

4

**ARGUMENT**

**I.    All four injunctive relief factors favor a temporary restraining order and a preliminary injunction.**

Plaintiffs are entitled to a temporary restraining order and a preliminary injunction to prevent defendants from draining their Roblox accounts and moving the money abroad, effectively beyond plaintiffs' reach.  This injunctive relief preserves specific, identifiable Roblox revenue flowing through a Roblox account over which plaintiffs have an equitable interest—the precise funds that are the subject of the accounting of profits, constructive trust, and disgorgement or restitution in this case.  These equitable interests permit this Court to issue a preliminary injunction.  *See Leadenhall Cap. Partners LLP v. Advantage Cap. Holdings LLC*, 171 F.4th 155, 163 (2d Cir. 2026) (courts may freeze assets when the "ultimate relief [plaintiff] seeks gives rise to an equitable interest").

**A.    Plaintiffs are likely to succeed on the merits.**

Plaintiffs are likely to prevail on three central claims that support injunctive relief: (1) copyright infringement; (2) breach of fiduciary duties; and (3) conversion.

**1.    Defendants' ongoing use of protected works constitutes copyright infringement.**

To succeed on a copyright infringement claim, plaintiffs must show "(1) ownership of a valid copyright and (2) infringement by the defendant." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir. 2001).  A defendant who infringes on another's copyright will be subject to liability for "disgorgement of profits, and a possible injunction." *Craig v. UMG Recordings, Inc.*, 380 F. Supp. 3d 324, 337 (S.D.N.Y. 2019); *see also ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 631–32 (6th Cir. 2020) (holding that 17 U.S.C. § 504 "makes clear that Congress wished to make two distinct types of monetary recovery available to injured parties—'the actual

5

damages suffered' as a result of the infringement, and the disgorgement of the infringer's profits that  were 'attributable to the infringement.'").

Here, plaintiffs will be able to prove ownership of a valid copyright, and that defendants infringed on that copyright.  *See Yurman Design, Inc.*, 262 F.3d at 109.  Haque owns registered copyrights in the source code underlying *Anime Vanguards* (U.S. Copyright Reg. TXu 2-541-660) and the Game's audiovisual works (U.S. Copyright Reg. PA 2-584-333).  (Haque Decl. ¶ 6.)  Copyright registration is prima facie evidence of both the validity of the copyright and the facts stated in the registration certificate.  17 U.S.C. § 410(c).  Haque created these works as their sole author, and each is an independently authored module with separate existence and function apart from the Game.  (Haque Decl. ¶¶ 4-5.)  He did not intend his authorship to merge with anyone else's, and none of his code or visual effects were a work made for hire.  (*Id.* ¶ 5.)  Nor did Haque offer defendants a limitless license to use his works without any compensation.  (*Id.*)[2]

Defendants continue to infringe on Haque's copyrights by operating *Anime Vanguards* every day.  That operation necessarily reproduces, distributes, publicly displays, and prepares derivative works of the Protected Works, and incorporates derivative versions of them into each game update, in violation of 17 U.S.C. §§ 106 and 501.  Haque is therefore likely to succeed on his copyright claim and receive an equitable accounting and disgorgement.  This equitable interest permits injunctive relief freezing defendants' assets.  *See United States v. Keyspan Corp.*, 763 F. Supp. 2d 633, 639 (S.D.N.Y. 2011) (disgorgement is an equitable remedy); *see also United States Sec. & Exch. Comm'n v. Collector's Coffee Inc.*, 602 F. Supp. 3d 488, 494 (S.D.N.Y. 2022) (courts may freeze assets to preserve equitable remedy of disgorgement); *Coley*

---

[2] *Anime Vanguards* is not a joint work; but if it is, plaintiffs are still entitled to an equitable accounting, which further bolsters the need for a preliminary injunction.  *Merch. v. Lymon*, No. 87CIV.7199(BDP)(NRB), 1995 WL 217508, at *2 (S.D.N.Y. Apr. 11, 1995) (" . . . each party to a joint work is entitled to an accounting from the other." (citing *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 223 F.2d 252, 254 (2d Cir. 1955)).

*v. Vannguard Urb. Improvement Ass'n, Inc.*, No. 12-CV-5565 (PKC) (RER), 2016 WL 7217641, at *3 (E.D.N.Y. Dec. 13, 2016) (an accounting and constructive trust are equitable remedies that support freezing assets).

### 2.    Defendants have breached their fiduciary duty of loyalty to Haque.

The parties' relationship as co-owners of *Anime Vanguards* created a fiduciary relationship governed by New York's highest standard of loyalty.  Under New York law, a partnership is created when four conditions exist: "(1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners." *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) (citing *North Am. Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.,* No. 99 Civ. 4643, 2000 WL 1290608, *1 (S.D.N.Y Sept. 11, 2000)).

All four conditions of partnership are met here.  Haque exercised joint control and management of *Anime Vanguards*, exercising the final say over much of the Game's direction, and was designated an "Owner."  (Haque Decl. ¶¶ 7-8.)  He brought his own skills to the table by personally contributing a majority of the Game's code.  (*Id.* ¶ 8.)  He contributed his own finances and skill to the Game, including funds to retain legal counsel and funds for the formation of a corporate entity.  (*Id.* ¶ 9.)  The parties intended to be partners, as he was asked to personally sign agreements and corporate documents on behalf of the partnership, and personally acted as a representative for the partnership.  (*Id.* ¶¶ 7-9.)  Haque shared profits and losses through his revenue share, exposure to personal liability, and risk of lost funds he personally advanced.  (*Id.* ¶ 9.)

Partners owe each other "the duty of the finest loyalty." *Meinhard v. Salmon*, 249 N.Y. 458, 463-64, 164 N.E. 545 (1928).  A partner breaches his fiduciary duty of loyalty when he

7

takes actions that place his personal interests above those of his co-partners or uses his control over partnership affairs to enrich himself at the partnership's expense. *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466, 539 N.E.2d 574 (1989). This prohibition on self-dealing is not limited to the classic case of a partner secretly capturing a business opportunity; it equally reaches conduct by which a partner manages the jointly-owned business in a manner designed to benefit himself at the detriment of the enterprise's long-term value and his co-partners' interests. *See id*. (duty of loyalty is "a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty"). A partner's breach of fiduciary duty is not limited to immediate cash losses, and may occur through impairment of goodwill, competitive position, or workforce retention. *See Gibbs v. Breed, Abbott*, 271 A.D.2d 180, 190-91, 710 N.Y.S.2d 578 (N.Y. App. Div. 2000).

Defendants breached their fiduciary duties to Haque by, at the very least, converting partnership assets, infringing Haque's copyrights, and withholding profits. *See Yador v. Mowatt*, No. 19-CV-4128(EK)(RML), 2021 WL 4502442, at *5 (E.D.N.Y. Sept. 30, 2021) (plaintiff stated claim for breach of fiduciary duty when partner converted partnership assets and marketed trademark as his own); *see also Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 307 (2d Cir. 2004) (partners can be separately liable for breach of fiduciary duty for copyright infringement). Defendants' decisions to mass distribute monetized currency for free, remove valued content without justification, and introduce pay-to-win mechanics that alienate the Game's player base are also acts of self-dealing that benefit defendants with a short-term profit at the direct expense of Haque. *See Gibbs*, 271 A.D.2d at 184 (holding that partners breach their

8

fiduciary duty by taking actions for personal benefit despite causing downstream damage to partnership value).  Plaintiffs are thus likely to prevail on their breach of fiduciary duty claim.

"[D]isgorgement is a remedy for breach of fiduciary duty[.]"  *In re Meridian Funds Grp. Sec. & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 917 F. Supp. 2d 231, 241 (S.D.N.Y. 2013).  So is an accounting and constructive trust.  *Schneidman v. Tollman*, 190 A.D.2d 524, 525, 593 N.Y.S.2d 23, 24 (1993).  Thus, like above, plaintiffs have an equitable interest in the relief they seek.

### 3.    Defendants have converted Haque's revenue share.

Plaintiffs are likely to prevail on their conversion claim because defendants deliberately intercepted Haque's revenue allocation within Roblox's group-payout system and redirected it to themselves.

Under New York law, the "[t]wo key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights."  *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50, 860 N.E.2d 713 (2006) (internal citations omitted).  An action for conversion of money lies when the defendant is obligated to return or otherwise treat in a particular manner specific money belonging to the plaintiff.  *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (quoting *Vanderbilt Univ. v. Dipsters Corp.*, No. 84 Civ. 7215-CHS, 1986 WL 10471, at *3 (S.D.N.Y. Sept. 17, 1986)).  The funds must be specifically identifiable rather than a general obligation to pay.  *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 883, 452 N.Y.S.2d 599 (1982).  New York courts have long held that plaintiff's demand for return, and defendant's refusal, is required only when defendant's initial possession is lawful.  *MacDonnell v. Buffalo Loan, Tr. & Safe Deposit Co.*, 193 N.Y. 92, 101, 85 N.E. 801 (1908).  Proof of wrongful intent is not required; intent to exercise dominion over property in a manner

9

inconsistent with the plaintiff's rights is sufficient. *LoPresti*, 126 F.3d at 42 (quoting *Fashions Outlet of Am., Inc. v. Maharaj,* No 88 Civ. 7231, 1991 WL 143421, at *2 (S.D.N.Y. July 22, 1991)).

Haque had possessory right or interest in 20% of the revenue generated by the Game. (Haque Decl. ¶¶ 7, 12.)  It was a defined, mechanically enforced allocation within Roblox's group-payout system, which automatically distributed a specified percentage of each revenue cycle to each participating owner.  (*Id*. ¶ 11-12.)  Every time the Game generated revenue, Roblox's system earmarked Haque's share before defendants could claim it.  (*Id*. ¶¶ 12, 18.)  The funds are specifically identifiable from the Game's Roblox payout records and segregable as a defined percentage of revenue during discrete periods.  (Compl. ¶ 58.)  This is precisely the kind of specifically identifiable fund that New York courts distinguish from a general debt.  *See LoPresti*, 126 F.3d at 41 (president of a company who withheld employees' union dues from their wages and redirected those funds to pay company creditors instead of forwarding them to the union had committed conversion).  Defendants here did not merely fail to pay Haque; they intercepted a mathematically defined slice of incoming revenue that the platform infrastructure had already allocated to him.  (Haque Decl. ¶ 12.)

On January 14, 2026, defendants removed Haque's Roblox group membership and reallocated his revenue share to themselves.  (Compl. ¶¶ 27, 59.)  That single act intercepted an existing allocation stream and rerouted it to defendants' accounts.  (Haque Decl. ¶ 12.)  They have continued to collect Game revenue through a payout structure from which Haque has been stripped, pocketing his share in every subsequent revenue cycle.  (Haque Decl. ¶¶ 12, 14, 16, 18.)

Haque demanded that defendants return the wrongfully diverted funds.  (Compl. ¶ 60.)  Defendants refused, and continued to divert the funds.  (Haque Decl. ¶¶ 16, 18.)  The demand

element is therefore satisfied.  In any event, where the taking was unauthorized from the outset, demand is not a prerequisite to the claim; the tort is complete at the moment of the wrongful taking.  The deliberate removal of Haque from the Roblox payout group was such a taking.

In sum, defendants exercised unauthorized dominion over a specifically identifiable fund to which Haque held a superior possessory right, and they have continued to do so.  Plaintiffs thus have an equitable interest in these specific funds supporting preliminary injunctive relief. *Linseth v. Sustayta*, No. 1:21-CV-173, 2022 WL 2829740, at *4 (D.N.D. June 8, 2022) (conversion is equitable in nature and thus supports preliminary injunction); *see also AAAG-California, LLC v. Kisana*, 439 F. Supp. 3d 1265, 1278 (D. Utah 2020) (same).

**B.      Plaintiffs will suffer irreparable harm absent temporary and preliminary injunctive relief.**

Plaintiffs will continue to suffer irreparably without temporary and preliminary injunctive relief.  A plaintiff is irreparably harmed if there will be nothing to collect in the event that they prevail.  The Second Circuit has recognized that dissipation risk independently justifies injunctive relief where the defendant "would be unable to pay damages should [plaintiff] prevail." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012); *see also Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) (" . . . courts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents"). "A preliminary injunction may issue to preserve assets as security for a potential monetary judgment where the evidence shows that a party intends to frustrate any judgment on the merits by making it uncollectible." *Gelfand v. Stone*, 727 F. Supp. 98, 100 (S.D.N.Y. 1989).  This risk is especially high where defendants live abroad and may secret away their assets through foreign transfers, as "preliminary injunctions are proper to prevent a defendant from making a judgment uncollectible." *Republic of Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986).

11

Popov resides in Sweden and Acuña in the Philippines.  (Compl. ¶¶ 5–6.)  Neither is known to maintain domestic assets.  The Game's revenue flows through the Roblox payout system under their exclusive control, directed to their individual Roblox accounts where it can then be withdrawn to their foreign accounts.  (Haque Decl. ¶¶ 18, 36, 39.)  Enforcing an eventual judgment from this Court against foreign defendants may well be impossible.

Defendants have already demonstrated the speed and unilateralism with which they can move money.  They expelled Haque from the Game and zeroed his payout allocation without any notice or process. (Compl. ¶ 27.)  There is no reason to believe that the pendency of this litigation will cause them to voluntarily preserve the funds they are otherwise disbursing abroad each month. *See Republic of Philippines*, 806 F.2d at 356 (allowing preliminary relief "intended to prevent any transfer or encumbrance of [assets] that would place them beyond [plaintiff]'s reach or would prevent reconveyance of the properties to [plaintiff]" by a foreign defendant).

This harm is bolstered by defendants' recent changes to the Game, which risk draining the revenue flow in exchange for a short-term boost to defendants' foreign accounts. Specifically, the mass distribution of trait rerolls for free, the removal of vanguard tier unit models, and the introduction of the pay-to-win Memorias system are not rational management decisions for a team committed to sustaining long-term game value.  They are the decisions of a team front-loading revenue extraction while the Game still has players.  The CEO of plaintiff Boss Studio has seen the results this tactic yields: an initial engagement spike followed by sharp player loss. (Ha Decl. ¶¶ 1, 11.)  *Anime Vanguards* is already showing the same pattern.  (*Id*. ¶¶ 12, 13.)

If the Game collapses in player count and revenue before this case concludes, the base from which any accounting of profits or damages award would be satisfied will have shrunk

12

irreversibly. That harm—a permanently diminished recovery pool—is not compensable after the fact, because there is no mechanism to resurrect a dispersed gaming community or recapture the revenues that would have been generated from a still-healthy game. *Cf. Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (loss of goodwill and business opportunities constitutes irreparable harm). The only way to prevent this irreparable harm is to ensure that the Game revenue is preserved in an account from which plaintiffs can recover.

### C.     The balance of equities favors plaintiffs.

The harm to plaintiffs from denying the requested relief is severe. Every day that defendants are able to divert funds out of the country diminishes the pool from which plaintiffs can recover. And this pool of funds continues to shrink as a result of defendants' changes meant to maximize short-term profit, allowing defendants to siphon the dwindling Game funds out of the country. (Ha Decl. ¶¶ 14-17; Haque Decl. ¶¶ 38-39.) That harm is permanent and cumulative. (Ha Decl. ¶ 18.)

The burden on defendants from the requested relief is minimal. The requested injunction asks only that defendants preserve Game revenue in the existing, domestic Roblox accounts up to the amount that plaintiffs have pleaded entitlement (just over $8 million, which is significantly less than the Game's revenue last year). Defendants are free to remove funds beyond that amount. No legitimate interest is harmed by keeping this limited Game revenue in Roblox accounts while this litigation proceeds, thereby deterring defendants from their strategy of a short-term squeeze.

To the extent this relief disincentives defendants' attempt to make a quick profit at the expense of the Game, this is not a legitimate hardship. Where a defendant's claimed hardship flows from its own deliberate misconduct, a court need not credit that hardship in the equitable balance: "[plaintiff] should not have to suffer irreparable harm to save [defendant] from its self-

13

imposed fate." *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 625-26 (S.D.N.Y. 2010). The *Rex Med.* court rejected the defendant's claimed hardship of being required to continue performing its contractual obligations, holding that defendants cannot ask the plaintiff "to bear the burden of [defendant's] poor decision making" or "the cost of [defendant's] mistakes." (*Id*. at 625) By keeping the Game revenue in the Roblox system during the pendency of the litigation, defendants are simply being required to comply with their legal obligations.

### D. The public interest supports granting the requested relief.

The public interest is served by the narrow relief plaintiffs seek. An injunction would harm no third party and imposes no burden on the public. It would simply preserve a specific, identifiable fund in which plaintiffs claim an equitable ownership interest, ensuring that this Court retains the ability to grant the equitable relief plaintiffs ultimately seek. Without an injunction, the public would be disserved by allowing defendants to unjustly divert funds belonging to another outside the reach of this Court, preventing the Court from awarding complete equitable relief.

## II. The temporary restraining order should issue without notice.

### A. FRCP 65, not the Hague Convention, governs notice requirement.

FRCP 65 provides that "[t]he court may issue a preliminary injunction only on *notice* to the adverse party" (emphasis added). Where, as here, defendants live abroad, standards for service of process are set forth in the Hague Convention. *Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163. The Hague Convention generally requires that a completed Model Form and the documents to be served be submitted to a designated central authority, usually the Foreign Ministry, in the defendant's home country. (*Id.* at Art. 3.) However, by its express

14

terms, the service procedure set forth in the Hague Convention does not apply to "provisional or protective measures," including preliminary injunctions or temporary restraining orders under Rule 65.  (*Id*. at Art. 15); *Fox Corp. v. Media Deportes Mexico, S. de R.L. de C.V.*, 820 F. Supp. 3d 299, 308 (S.D.N.Y. 2026) (holding that preliminary injunctions and temporary restraining orders issued under Rule 65 are the type of provisional or protective measures contemplated by Article 15 of the Hague Convention).  Thus, the Hague Convention does not control here.

### B.        The temporary restraining order should issue without notice.

Under the circumstances here, the temporary restraining order that plaintiffs request should be issued *ex parte* to ensure the relief in that order remains effective.  Rule 65(b) authorizes courts to enter a temporary restraining order *ex parte* where, as here, the moving party sets forth facts that show an immediate and irreparable injury and why notice should not be required.  Fed. R. Civ. P. 65(b)(l); *see also In re Vuitton et Fils S.A.,* 606 F.2d 1, 4 (2d Cir. 1979) (per curiam) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Loc. No. 70,* 415 U.S. 423, 439 (1974)).  Under this rule, an order may be issued without notice if (1) "an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result" before hearing from the adverse party, and (2) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  Fed. R. Civ. P. 65(b)(l).  A temporary restraining order "may be ordered on an *ex parte* basis under subdivision (b) if the applicant makes a strong showing of the reasons why notice is likely to defeat effective relief."  Fed. R. Civ. P. 65 Comm. Notes on Rules.[3]

---

[3] Local Rule 6.1(d) requires "a clear and specific showing by affidavit that contains good and sufficient reasons why a procedure other than by notice of motion is necessary and states whether a previous application for similar relief has been made."  Plaintiffs have met that standard as well.  *See* Levy Decl. ¶ 5.

*Ex parte* orders are proper when notice "appears to serve only to render fruitless further prosecution of the action." *In re Vuitton,* 606 F.2d at 5; *see also Granny Goose Foods,* 415 U.S. at 439.  Courts commonly grant *ex parte* temporary restraining orders to prevent copyright infringers from collecting ill-gotten gains.  *See, e.g., XYZ Corp. v. Individuals, Corps., Ltd. Liab. Cos., P'ships, & Unincorporated Ass'ns Identified on Schedule A,* No. 24-CV-4428 (LLS), 2024 WL 3718106 (S.D.N.Y. Aug. 6, 2024); *U2 Home Ent., Inc. v. Bowery Music City, Inc.*, No. 03 CIV. 8909 (RJH), 2003 WL 22889738, at *1 (S.D.N.Y. Dec. 8, 2003).  Similarly, temporary restraining orders are frequently issued on an *ex parte* basis to prevent foreign defendants from transferring assets beyond the court's jurisdiction.  *F.T.C. v. Verity Int'l, Ltd.*, 124 F. Supp. 2d 193, 198 (S.D.N.Y. 2000) (issuing *ex parte* temporary restraining order to freeze foreign defendants' accounts and ordering "repatriation of assets . . . in order to ensure the Court's ability to grant effective relief"); *Hayward Indus., Inc. v. Ningbo C.F. Elec. Tech Co., LTD.*, No. 320CV00710MOCSCR, 2024 WL 1587024, at *2 (W.D.N.C. Apr. 11, 2024) (issuing *ex parte* temporary restraining order because "the prospect of collecting money damages from a foreign defendant with few to no assets in the United States tips in favor of a finding of irreparable harm."); *CCA & B, LLC v. Anhui Subang Energy Conservation Tech. Co.*, No. 1:23-CV-178-TWT, 2023 WL 3627885, at *4 (N.D. Ga. Feb. 3, 2023) (issuing *ex parte* temporary restraining order reasoning that foreign defendants "often 'disappear' when notified that their conduct is unlawful").

Both defendants are foreign nationals domiciled abroad with no known assets in the United States.  The revenue at stake originates in Roblox's United States-based Group payout system, and can be transferred to foreign accounts almost instantaneously.  Advance notice of this motion would give defendants the opportunity to transfer Game-generated revenue beyond

16

this Court's jurisdiction before any order can issue.  (Decl. of Joseph M. Levy ("Levy Decl.") ¶ 3.)  That is precisely the harm Rule 65(b) is designed to prevent.  *See* Fed. R. Civ. P. 65(b)(1); *In re Vuitton*, 606 F.2d at 5 (*ex parte* order proper when notice "appears to serve only to render fruitless further prosecution of the action").

Defendants have already demonstrated their willingness to unilaterally deprive Haque access to the Roblox payout group.  Given the opportunity, defendants already redirected Haque's revenue share beyond his reach.  They have already shown they are willing to take immediate, covert action to protect their financial position when they perceive a threat.  There is every reason to believe they would do the same here, draining the Roblox payouts the moment they learn this litigation targets those proceeds.

To ensure that the *ex parte* relief is strictly limited to "serving [its] underlying purpose," *Granny Goose Foods,* 415 U.S. at 439, as soon as the temporary restraining order becomes effective, plaintiffs will deliver to defendants via email copies of the motion to show cause, the proposed orders, and all memoranda and declarations in support of those filings, and will provide actual notice the preliminary injunction hearing as soon as it is scheduled.

## III.    No bond or only a nominal bond should be required.

Rule 65(c) requires that a temporary restraining order or preliminary injunction issue only if the movant provides "security in an amount that the court considers proper."  Fed. R. Civ. P. 65(c).  This rule vests the Court with "wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm, or where the injunctive order was issued 'to aid and preserve the court's jurisdiction over the subject matter involved.'"  *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (quoting *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir.1961)).

The relief requested here asks defendants only to preserve limited Game revenue in identifiable, domestic Roblox accounts.  There is no cognizable harm in being required to temporarily maintain the Game revenue in defendants' Roblox accounts while plaintiffs' claims are litigated, thereby disincentivizing defendants from creating a temporary spike in game revenue at the price of long-term sustainability.  No legitimate business interest of defendants will be damaged by an order would merely require them to cease manipulative conduct rather than accept any affirmative obligation.  *See Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590 (W.D.N.Y. 2011) ("All that this injunction does is require [the enjoined party] to continue to perform under the contract, as it has been doing for years.  That hardly constitutes a cognizable 'harm' to [the enjoined party].").  Plaintiffs should not be required to provide a bond, or at most, a nominal bond should be required.

## IV.    Expedited discovery is necessary for the preliminary injunction hearing.

Plaintiffs also request an order allowing limited discovery on an expedited basis in advance of the preliminary injunction hearing.

Rule 26 permits this Court to authorize discovery before the Rule 26(f) conference.  Fed. R. Civ. P. 26(d)(1).  Courts in this district evaluate such requests under a "flexible standard of reasonableness and good cause," examining the "entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances."  *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 326-27 (S.D.N.Y. 2005) (italics omitted).

There is good cause for expedited discovery.  Haque holds registered copyrights in the source code and visual effects that have driven the Game since late 2024.  Defendants removed him from the Roblox payout system on January 14, 2026, without notice or compensation.  Haque has received nothing after being removed.

18

The risk of dissipation is not speculative.  Defendants live abroad, and have both the incentive and practical capacity to move game revenues to accounts beyond this Court's jurisdiction.  *See Ayyash*, 233 F.R.D. at 327 (expedited discovery warranted where "defendants are foreign individuals and corporations who have both incentive and capacity to hide their assets").  That risk has sharpened now that defendants are on notice of this action, increasing their incentive to move liquid assets offshore before the preliminary injunction hearing.  *Id.* Defendants have already demonstrated they are willing to act unilaterally and without warning by removing Haque from his ownership position, his payout allocation, and all Discord channels in a single coordinated act on January 14, 2026.

The discovery requests plaintiffs intend to propound are targeted to the specific evidentiary needs of this motion.  (*See* Levy Decl., Exs. 1-3.)  Plaintiffs intend to request identification of Roblox payout and downstream financial accounts receiving game revenue since January 14, 2026, along with communications concerning any movement or withdrawal of those funds to foreign accounts.  This information is indispensable to any asset preservation order.  Without it, assessing the risk of dissipation and the movement of funds becomes nearly impossible.  An interrogatory asking defendants to identify all revenue-receiving accounts and disclose the total game revenue and its current location will establish where the funds have been allocated since Haque's removal.  Document requests targeting game updates between May 22 and June 22, 2026 will show whether defendants have attempted to excise Haque's registered copyrighted works from the Game after learning of this litigation, bearing directly on the scope of ongoing infringement and the inadequacy of damages as a remedy.

Plaintiffs will also seek documents and communications concerning any plan to sell, transfer, or wind down the Game, which would address the risk that defendants attempt to

19

convey the Game, and the copyrighted works embedded in it, to a third party or foreign entity before this Court can act.

Finally, a Rule 45 subpoena to Roblox Corporation for the group's payout allocation and payout history from November 1, 2024, to the present will yield the authoritative record of who received what share of each payout and when that allocation changed. That data is uniquely within Roblox's custody, cannot be derived from defendants' own records, and goes to the heart of both the damages claim and the preservation relief sought. These requests are narrow, limited to the financial and operational information needed to prepare the preliminary injunction record, and are reasonably calibrated to avoid undue burden before the Rule 26(f) conference.

## CONCLUSION

Defendants have unilateral control of the funds at issue in this case. They have already demonstrated their willingness to avoid their obligations to pay what they owe. If they continue to move Game revenue into foreign accounts, plaintiffs may never recover. Plaintiffs respectfully request that the Court issue temporary and preliminary injunctions to protect *Anime Vanguards*' limited pool of funds, before it is drained out of the country.

20

DATED: July 24, 2026          MARKOWITZ HERBOLD PC


*/s/ Joseph M. Levy*
Joseph M. Levy, *admitted pro hac vice*
JosephLevy@MarkowitzHerbold.com
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085

Harry B. Wilson, NY # 5864483
HarryWilson@MarkowitzHerbold.com
603 3rd Avenue, Floor 16
New York, NY  10158
Telephone: (212) 909-2610

*Attorneys for Plaintiff Boss Studio LLC*

DATED: July 24, 2026          PERAINO MALINOWSKI LLP


*/s/ David M. Peraino*
David M. Peraino
DPeraino@PMLaw.nyc
152 Madison Avenue, 16th Floor
New York, New York 10016
Telephone: (646) 930-8602

*Attorneys for Plaintiff Rehaab Haque*

## CERTIFICATE OF COMPLIANCE WITH L.R. 7.1(c)

I certify that this brief complies with the applicable word-count limitation under L.R. 7.1(c) because it contains 6,167 words, including headings, footnotes, and quotations, but excluding the caption, any index, table of contents, table of authorities, signature blocks, and any required certificates.

DATED: July 24, 2026

/s/ Joseph M. Levy
Joseph M. Levy, *admitted pro hac vice*
*Attorneys for Plaintiff Boss Studio LLC*

1