UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BOSS STUDIO LLC, a Wyoming LLC; and REHAAB HAQUE, an individual,<br><br>        Plaintiffs,<br><br>        -against-<br><br>VLADISLAV POPOV, an individual; and ANDREI ACUÑA, an individual,<br><br>        Defendants. | Case No.: 1:26-cv-04323-GBD |

**VLADISLAV POPOV'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER, AN ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

FRANKFURT KURNIT KLEIN + SELZ, PC
Caren Decter
Jeremy Goldman
Peter A. Devlin
Regina Gerhardt
28 Liberty Street, 35th Fl.
New York, NY 10005
(212) 980-0120
cdecter@fkks.com
jgoldman@fkks.com
pdevlin@fkks.com
rgerhardt@fkks.com

*Attorneys for Defendant Vladislav Popov*

**TABLE OF CONTENTS**

**Page**

I.    THE EX PARTE APPLICATION WAS IMPROPER AND
      INDEPENDENTLY WARRANTS DENIAL. ........................................................5

II.   PLAINTIFFS ARE NOT ENTITLED TO A PRE-JUDGMENT ASSET
      FREEZE TO SECURE THEIR MONETARY CLAIMS.......................................6

III.  PLAINTIFFS DO NOT DEMONSTRATE IRREPARABLE HARM. ..................8

IV.   PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON
      THE MERITS. ..................................................................................................11

      A.    Plaintiffs' Copyright Infringement Claim is Fatally Flawed .....................12

      B.    Plaintiffs Do Not Plead a Special Relationship Giving Rise to
            Fiduciary Duties.......................................................................................14

      C.    Plaintiffs Do Not Adequately Plead a Conversion Claim..........................17

V.    THE EQUITIES AND PUBLIC INTEREST WEIGH DECISIVELY
      AGAINST RELIEF. ..........................................................................................18

VI.   PLAINTIFFS' EXPEDITED DISCOVERY REQUESTS ARE
      IMPROPER.........................................................................................................19

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16 Casa Duse, LLC v. Merkin*,
791 F.3d 247 (2d Cir. 2015).................................................................................12, 13, 14

*ACLI Gov't Sec., Inc. v. Rhoades*,
813 F. Supp. 255 (S.D.N.Y.), aff'd sub nom ...........................................................16

*Blizzard Entertainment, Inc. v. Lilith Games (Shanghai) Co.*,
2017 WL 2118342 (N.D. Cal. May 16, 2017) ...................................................13, 14

*Brenntag Int'l Chemicals, Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999)...................................................................................8

*Childress v. Taylor*,
945 F.2d 500 (2d Cir. 1991)..................................................................................14

*Christmas House USA, Inc. v. Christmasland Experience LLC*,
2022 WL 17852025 (E.D.N.Y. Dec. 22, 2022) .......................................................11

*Coley v. Vannguard Urb. Improvement Ass'n, Inc.*,
2016 WL 7217641 (E.D.N.Y. Dec. 13, 2016) ..........................................................6

*Daub v. Future Tech Enter., Inc.*,
65 A.D.3d 1004, 885 N.Y.S.2d 115 (2009) ............................................................17

*In re Feit & Drexler, Inc.*,
760 F.2d 406 (2d Cir. 1985)..................................................................................8

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ..........................................................................13, 14

*Gelfand v. Stone*,
727 F. Supp. 98 (S.D.N.Y.1989) ...........................................................................9

*Gladstone v. Waldron & Co.*,
1998 WL 150982 (S.D.N.Y. Mar. 31, 1998) ..........................................................10

*Granny Goose Foods v. Teamsters Local 70*,
415 U.S. 423 (1974).............................................................................................5

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999)..........................................................................................1, 6

*JSG Trading Corp. v. Tray–Wrap, Inc.*,
    917 F.2d 75 (2d Cir.1990)..................................................................................................10

*Kidz Cloz, Inc. v. Officially For Kids, Inc.*,
    320 F. Supp. 2d 164 (S.D.N.Y. 2004)...............................................................................15

*Leadenhall Cap. Partners LLP v. Advantage Cap. Holdings LLC*,
    171 F.4th 155 (2d Cir. 2026) .............................................................................6, 7, 8, 18

*Lebedev v. Blavatnik*,
    193 A.D.3d 175 (1st Dep't 2021) .......................................................................................16

*Levy v. Young Adult Inst., Inc.*,
    2015 WL 170442 (S.D.N.Y. Jan. 13, 2015) ..................................................... *passim*

*Magnet Communications LLC v. Magnet Communications, Inc.*,
    2001 WL 1097865 (S.D.N.Y. Sept. 19, 2001)...........................................................11

*Markowitz Jewelry Co. v. Chapal/Zenray, Inc.*,
    988 F. Supp. 404 (S.D.N.Y. 1997) ....................................................................................11

*Nasso v. Bio Reference Lab'ys, Inc.*,
    892 F. Supp. 2d 439 (E.D.N.Y. 2012) ..............................................................................17

*Next/Ingle Holdings, LLC v. GSPP HOLDCO III, LLC*,
    2026 WL 1398474 (S.D.N.Y. May 19, 2026) (Daniels, J.).....................................17

*Notaro v. Koch*,
    95 F.R.D. 403 (S.D.N.Y. 1982) .........................................................................................19

*Peter F. Gaito Architecture, LLC v. Simone Development Corp.*,
    602 F.3d 57 (2d Cir. 2010)..................................................................................................12

*Peters Griffin Woodward, Inc. v. WCSC, Inc.*,
    88 A.D.2d 883 (1982) ...........................................................................................................17

*Pivotal Payments, Inc. v. Phillips*,
    2014 WL 6674621 (E.D.N.Y. Nov. 25, 2014)...............................................................9, 11

*Priolo Commc'ns, Inc. v. MCI Telecommunications Corp.*,
    248 A.D.2d 453 (1998) .........................................................................................................17

*Scott v. Rosenthal*,
    2000 WL 1863542 (S.D.N.Y. Dec. 20, 2000) ...............................................................16

*SEC v. Collector's Coffee Inc.*,
    602 F. Supp. 3d 488 (S.D.N.Y. 2022)................................................................................7

iii

*Seide v. Crest Color, Inc.*,
    835 F. Supp. 732 (S.D.N.Y.1993) ................................................................9

*Slabakis v. Schik*,
    164 A.D.3d 454 (1st Dep't 2018) ................................................................15

*Steinbeck v. Gerosa*,
    4 N.Y.2d 302 (1958) ................................................................15

*The Comic Strip, Inc. v. Fox Television Stations, Inc.*,
    710 F. Supp. 976 (S.D.N.Y. 1989) ................................................................11

*Thomson v. Larson*,
    147 F.3d 195 (2d Cir. 1998) ................................................................14

*Tough Traveler, Ltd. v. Outbound Prods.*,
    60 F.3d 964 (2d Cir. 1995) ................................................................11

*Tucker Anthony Realty Corp. v. Schlesinger*,
    888 F.2d 969 (2d Cir.1989) ................................................................8

*United States v. Keyspan Corp.*,
    763 F. Supp. 2d 633 (S.D.N.Y. 2011) ................................................................7

*Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex.*,
    87 N.Y.2d 36 (1995) ................................................................17

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
    423 F.3d 137 (2d Cir. 2005) ................................................................11

*WPIX, Inc. v. ivi, Inc.*,
691 F.3d 275 (2d Cir. 2012) ................................................................7

**Statutes**

17 U.S.C. § 102(a) ................................................................12, 13

N.Y. P'ship Law § 11(4)(b) ................................................................16

**Other Authorities**

Fed. R. Civ. P. 26(f) ................................................................3

Fed. R. Civ. P. 45 ................................................................3, 20

Fed. R. Civ. P. 65 ................................................................5

Fed. R. Civ. P. 65(b)(1) ................................................................5

S.D.N.Y. Local Civ. R. 6.1(d) .......................................................................................................5

Defendant Vladislav Popov ("Popov") respectfully opposes Plaintiffs' *Ex Parte* Motion for a Temporary Restraining Order, an Order to Show Cause Re: Preliminary Injunction, and Expedited Discovery (the "Motion"; Dkt. 25) filed by Plaintiffs Boss Studio LLC ("Boss Studio") and Rehaab Haque ("Haque") on July 24, 2026.

## PRELIMINARY STATEMENT

Plaintiffs' *ex parte* motion lacks any basis in fact or law. It asks this Court to freeze more than $8 million in assets generated by Defendants' video game, *Anime Vanguards*, pending resolution of a spurious lawsuit brought by the game's primary competitor. A pre-judgment asset freeze is an extraordinary remedy reserved for the rarest circumstances. The Supreme Court held in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) that a federal court may not freeze a defendant's assets merely to secure a potential money judgment. Rather, this exceptional remedy is available only where a plaintiff seeks equitable relief and provides concrete evidence that a defendant is concealing or dissipating assets in order to render a judgment uncollectible.

Plaintiffs do not come close to making that showing. Their claims for breach of contract, copyright infringement, breach of fiduciary duty and conversion all seek the same thing: payment of Haque's alleged share of *Anime Vanguards*' revenue. That is a claim for money damages. Plaintiffs identify no lien, constructive trust, or other preexisting equitable interest in Defendants' assets. Under *Grupo Mexicano*, this Court therefore lacks authority to restrain those assets before judgment.

Nor is there any factual basis for this emergency relief, much less relief without notice. Plaintiffs provide no evidence that they will suffer irreparable harm absent the asset freeze. They do not show that Defendants face imminent risk of insolvency or that Defendants are dissipating or concealing assets to frustrate a judgment. Their application rests largely on the fact that

Defendants reside abroad, which does not transform a damages claim into an equitable one or justify a pre-judgment asset freeze. Their attempt to proceed *ex parte* is highly improper. Despite being in contact with defense counsel for months, Plaintiffs made no effort to notify Defendants of this application. Defense counsel learned of it only by happenstance two days before the hearing.

Plaintiffs' claims also fail on the merits. The lawsuit is fundamentally a contract claim: Haque alleges that Defendants promised him a 20% revenue share, later reduced to 10%, and stopped paying him after his role on the game ended. Because Plaintiffs cannot freeze assets to secure a contract claim for money damages, they rely instead on their tag-along claims for copyright infringement, conversion and breach of fiduciary duty. None is viable.

The copyright claim fails because Haque does not own any copyright that Defendants could have infringed. He alleges only that he contributed certain creative elements to *Anime Vanguards*, a single, integrated audiovisual work. Under controlling Second Circuit law, copyright does not separately subsist in an individual's contributions to a unitary work. Haque disclaims joint authorship of the game, and the allegations would not support joint authorship in any event. Without ownership of a copyright in either the game or an independently copyrightable work, his infringement claim fails as a matter of law.

The fiduciary-duty claim is similarly deficient. Plaintiffs plead no partnership or other special relationship giving rise to fiduciary obligations. Boss Studio has no relationship with Defendants at all, apart from being their primary competitor and the alleged assignee of Haque's claims. Haque, meanwhile, was one of many developers and contributors who worked on *Anime Vanguards* and received a revenue share as compensation for their services. Plaintiffs do not identify the alleged partners or explain which of the many revenue-share recipients supposedly

2

belonged to the partnership. Plaintiffs also fail to allege, as they must, that Haque shared responsibility for the debts and liabilities of the alleged partnership. Absent an agreement regarding loss sharing, there can be no partnership under New York law.

The conversion claim is equally defective. Plaintiffs identify no specific, segregated fund belonging to Haque. They claim only entitlement to a percentage of Defendants' general revenue, which is a debt, not property subject to conversion. Their claim merely repackages their breach of contract claim and cannot be independently maintained.

The remaining TRO factors independently require denial. As to the balance of hardships, Plaintiffs ask the Court to freeze $8,150,480 of Defendants' Roblox revenue, which by Plaintiffs' own account is roughly two-thirds of the Game's annual income. This would choke *Anime Vanguards*' operating funds, leaving Defendants unable to pay developers and cover other necessary operating expenses. The request is self-defeating on its face. A plaintiff genuinely seeking to protect a revenue interest would not seek to destroy the enterprise generating it. But Boss Studio is *Anime Vanguards*' primary competitor, and starving the game of operating funds would accomplish through litigation what Boss Studio has not accomplished in the marketplace: eliminating a rival.

Plaintiffs' overreach extends to their demand for expedited discovery. They seek interrogatories cataloguing every U.S.-based asset, document demands reaching every bank, brokerage, and cryptocurrency account, and a Rule 45 subpoena to Roblox—all on a compressed, seven-day schedule that appears nowhere in the Federal Rules. This invasive asset-tracing discovery is sought before the parties have even held their Rule 26(f) conference and includes highly sensitive information concerning Defendants' finances, operations, and business plan. It further confirms that the Motion is designed not to preserve the status quo but to cripple a

competitor.

The Motion is an abuse of the emergency-relief process aimed at shutting down a competing video game. For these reasons, and those set forth below, the Court should deny it in its entirety.

## BACKGROUND

Plaintiff Rehaab Haque is a video game developer. He alleges that he was engaged by Defendants to provide programming services for Defendants' video game, *Anime Vanguards*. Over the course of his engagement, he alleges that he created certain visual effects and game mechanics for *Anime Vanguards*. In lieu of a salary, Haque was paid for his services via a revenue share in *Anime Vanguards,* which rose to 20% effective December 13, 2024. Am. Compl. ¶ 18. However, on or about December 11, 2025, Haque expressed a desire to step back from the game. In exchange for a reduction in his responsibilities, he agreed that his revenue share would go down to 10%. Am. Compl. ¶ 25. Shortly thereafter, the relationship soured, and Defendants determined that his services were no longer needed. Popov Decl. ¶ 6. On January 14, 2026, Haque's role at *Anime Vanguards* was eliminated.

Without any basis in law or fact, Haque now claims that he owns a copyright interest in his individual contributions to the video game. He further demands that Defendants restore to Haque a 20% (or 10%) revenue share in *Anime Vanguards*, despite the fact that he is no longer working on the game.

It is unclear how Haque has standing to bring this lawsuit, given that he claims to have assigned all his claims to plaintiff Boss Studio (though it is unclear whether this assignment includes Haque's alleged copyright interests in his contributions to *Anime Vanguards*).

Moreover, Boss Studio's role in this litigation is very suspect. Boss Studio operates *Anime Last Stand*—"the primary competitor to Anime Vanguards." Ha Decl. ¶¶ 4–5. Plaintiffs'

4

*ex parte* motion—filed ten days after the Amended Complaint and prior to Defendant Acuña being served—asks the Court to freeze $8,150,480 of *Anime Vanguards*' revenue, which would essentially shut down the game. Popov Decl. ¶ 8. Plaintiffs' *ex parte* motion further demands invasive asset discovery to which Plaintiffs are not entitled at this early juncture.

The parties have been litigating on a cooperative schedule: Plaintiffs filed their original complaint on May 22, 2026, the parties agreed to a response deadline of August 28, 2026, and Plaintiffs filed their Amended Complaint on July 14, 2026—all while Defendant Acuña had not yet been served. Then, on July 24, 2026, without any warning to counsel with whom they had been corresponding for months, Plaintiffs filed the instant *ex parte* application.

## ARGUMENT

### I.    THE EX PARTE APPLICATION WAS IMPROPER AND INDEPENDENTLY WARRANTS DENIAL.

Relief without notice is reserved for the rare and extraordinary case in which specific facts "clearly show" that notice itself would cause immediate, irreparable injury; as such, the movant's attorney must certify the efforts made to give notice and why it should be excused. Fed. R. Civ. P. 65(b)(1); S.D.N.Y. Local Civ. R. 6.1(d); *see Granny Goose Foods v. Teamsters Local 70*, 415 U.S. 423, 439 (1974) ("The stringent restrictions imposed by s 17, and now by Rule 65, on the availability of ex parte temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute."). Plaintiffs' counsel has been in contact with Popov's counsel for months, yet made no effort to notify defense counsel of this filing. That failure has prejudiced Popov by giving him minimal time to respond, as undersigned counsel only discovered the *ex parte* motion by chance on July 28, 2026, two days before the hearing. Plaintiffs' transparent gamesmanship is an independent ground for denial.

5

## II.   PLAINTIFFS ARE NOT ENTITLED TO A PRE-JUDGMENT ASSET FREEZE TO SECURE THEIR MONETARY CLAIMS.

"Movants seeking to freeze assets in anticipation of a judgment face [an] additional hurdle to obtaining a preliminary injunction." *Levy v. Young Adult Inst., Inc.*, 2015 WL 170442, at \*5 (S.D.N.Y. Jan. 13, 2015). A federal court cannot freeze assets where the gravamen of the relief sought is money damages. *See Grupo Mexicano*, 527 U.S. at 310; *Leadenhall Cap. Partners LLP v. Advantage Cap. Holdings LLC*, 171 F.4th 155, 161 (2d Cir. 2026). "Basing its decision on the old division between law and equity, the Supreme Court held in *Grupo Mexicano* . . . that a party seeking to freeze assets must show that they have a lien or equitable interest in the property to be frozen." *Levy*, 2015 WL 170442, at \*5. The nature of the ultimate relief sought controls, not any labels plaintiffs place on their claims. *Leadenhall*, 171 F.4th at 163–64.

As Plaintiffs' lead authority confirms: "courts consistently refuse to allow preliminary injunctions when such injunctions essentially seek security for a potential future award of money damages and are requested merely because of a feared inability to collect." *Coley v. Vannguard Urb. Improvement Ass'n, Inc.*, 2016 WL 7217641, at \*3 (E.D.N.Y. Dec. 13, 2016) (citations omitted). In *Leadenhall*, for example, the Second Circuit vacated an asset freeze even though the district court found the defendants could not satisfy a judgment and intended to frustrate it, because that fear "does not alter the nature of the obligation." 171 F.4th at 164.

This case, simply put, is about money. The crux of Plaintiffs' Amended Complaint is a contract claim seeking monetary relief. Plaintiffs allege that in lieu of a salary, Haque received a 20% revenue share in *Anime Vanguards* (later reduced to 10%), which has not been paid since he left the Game in January 2026. Plaintiffs allege that the Game generated approximately $813,666 during Q1 2026. Applying a 10% revenue share, that would equate to approximately $81,300 in monetary damages in Q1 of 2026. A 10% revenue share from the past seven months would

6

amount to approximately $357,700. Popov Decl. ¶¶ 6-7. Yet Plaintiffs' application inexplicably seeks to freeze more than $8,000,000 in revenues. Regardless, Plaintiffs cannot obtain a pre-judgment asset freeze to secure their contract claim.

In apparent recognition of this, Plaintiffs rely on their tag-along claims for copyright infringement, fiduciary duty, and conversion to support their application for an asset freeze. But each of these claims also seeks a specified amount of monetary damages—*i.e.,* the 10% (or 20%) revenue share that Haque alleges he should receive despite no longer providing services for the Game. But "[a] claim for money due and owing under a contract is quintessentially an action at law." *Leadenhall*, 171 F.4th at 163–64 (citations omitted). An equitable interest is an interest in particular property that can "clearly . . . be traced to particular funds", not "a general interest in receiving compensation." *Id.*

Plaintiffs cite no case where a copyright infringement,[1] conversion or fiduciary duty claim permitted injunctive relief freezing defendants' assets. The only cases plaintiffs muster for freezing assets to secure disgorgement of profits are government enforcement actions: *United States v. Keyspan Corp.*, 763 F. Supp. 2d 633 (S.D.N.Y. 2011), and *SEC v. Collector's Coffee Inc.*, 602 F. Supp. 3d 488 (S.D.N.Y. 2022). In those cases, disgorgement runs to the sovereign under statutory equitable authority. Neither case involves a private plaintiff freezing assets to secure disgorgement on a copyright claim. While Plaintiffs rely on *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), that was not an asset freeze case. The court issued an injunction against ongoing infringement. Plaintiffs do not ask to stop the Game, confirming that the gravamen of the claims is monetary, not equitable relief.

---

[1] While a joint authorship claim would entitle Haque to an accounting, Haque specifically disclaims that the Game was a work of joint authorship. Haque Decl. ¶ 5 ("I did not intend my authorship to merge with anyone else's.").

An injury quantified to the precise dollar per month, plus a forward royalty, is fully compensable in damages. That alone defeats Plaintiffs' request for an asset freeze. Plaintiffs' fear that foreign defendants are moving funds abroad is precisely the rationale that was inadequate in *Leadenhall*.

## III.   PLAINTIFFS DO NOT DEMONSTRATE IRREPARABLE HARM.

Irreparable harm "is the 'linchpin' of a court's determination of whether a preliminary injunction is available." *Levy*, 2015 WL 170442, at *5 (quoting *Buckingham Corp. v. Karp,* 762 F.2d 257, 262 (2d Cir. 1985)). "The injury must be one requiring a remedy of more than mere money damages. A monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989). "Such a burden can be met in cases where the moving party has shown that the alleged injury could not be fairly and easily monetized." *Levy*, 2015 WL 170442, at *5 (citing *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 909 (2d Cir.1990) (preliminary injunction appropriate where alleged injury "incalculable in dollars and sense will likely occur")).

It is only in extraordinary circumstances where "a monetary preliminary injunction is permissible despite the relief sought being easily countable." *Levy*, 2015 WL 170442, at *5. These extraordinary situations include an imminent risk of insolvency, a demonstrated intent to frustrate a judgment on the merits, and past fraudulent activities. *See Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) ( "[C]ourts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents."); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985) (monetary preliminary injunction appropriate where defendant had repeatedly demonstrated intent "to frustrate any judgment on the merits by transferring its assets out of the jurisdiction" (internal quotations, citations and

8

alterations omitted)); *Seide v. Crest Color, Inc.*, 835 F. Supp. 732, 735 (S.D.N.Y.1993) (plaintiff had been unable to collect on past judgments); *Gelfand v. Stone,* 727 F. Supp. 98, 100–01 (S.D.N.Y.1989) ("There is substantial evidence of [defendant's] past fraudulent activities, as well as his on-going efforts to place his assets outside the reach of his creditors.").

None of these extraordinary circumstances are present here. Plaintiffs have not made sufficient allegations of wrongdoing to overcome the presumption against monetary preliminary injunctions. The fact that Defendants are located abroad does not, standing alone, support irreparable harm. There is nothing to indicate that Defendants have "specifically acted willfully in order to frustrate a judgment." *Levy*, 2015 WL 170442, at *5. The only evidence of their "speed and unilateralism with which they can move money" is Defendants' decision to stop paying Haque after he was terminated in January 2026. *See* Plaintiffs' Br. at 12.

Additionally, Plaintiffs offer no evidence that Defendants are or will be insolvent. *See Pivotal Payments, Inc. v. Phillips*, 2014 WL 6674621, at *4 (E.D.N.Y. Nov. 25, 2014) (finding no irreparable harm because plaintiff failed to demonstrate that any risk of insolvency is likely and imminent). Indeed, the only thing that would endanger their solvency would be the issuance of the $8 million freezing order. There is also no showing that Defendants have acted fraudulently or are acting to remove their assets from Plaintiffs' reach. *Levy*, 2015 WL 170442, at *5 (citing *Gelfand v. Stone*, 727 F. Supp. 98, 100–01 (S.D.N.Y. 1989) (finding irreparable injury because of defendant's past fraudulent activities, including prior guilty pleas for false statements, and ongoing efforts to place assets outside reach of creditors)). "[W]ithout a showing of such extraordinary circumstances and '[t]he nature of the relief sought being monetary compensation, there is no reason why [plaintiffs] cannot be made whole upon resolution of the merits.'" *Id.* (quoting *Abish v. Nw. Nat. Ins. Co. of Milwaukee, Wis.,* 924 F.2d 448, 453 (2d

Cir.1991)).

Instead, Plaintiffs argue that Defendants *may* lack sufficient assets to pay a judgment if Plaintiffs are successful in this lawsuit. *See JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79–80 (2d Cir.1990) (rejecting claim of irreparable harm absent segregation of trust funds where there was no evidence that defendant would be unable to satisfy possible judgment). Plaintiffs question certain recent decisions about the Game's monetization strategy—which they say may temporarily spike revenue, but ultimately lead to revenue decline. *See* Ha Decl. ¶¶ 7-15; Haque Decl. ¶¶ 19-32. However, Plaintiffs cannot obtain an asset freeze by second-guessing Defendants' decisions to utilize standard game monetization practices. Indeed, the founder of plaintiff Boss Studio admits that his company mirrored the same monetization strategies that he is now critiquing. Ha Decl. ¶ 12. Plaintiffs also question whether Defendants are burnt out and are considering winding down the game. Ha Decl. ¶¶ 16-17; Haque Decl. ¶ 35. But this speculation also cannot justify an $8 million asset freeze.

"Absent proof of impending insolvency, the plaintiffs face the same risk anyone faces when she brings an action: that the defendant may be unable to satisfy a judgment despite the strength of its financial position during the action." *Levy*, 2015 WL 170442, at *5. Conclusory allegations that Defendants' game monetization strategies may prove unsuccessful do not demonstrate a likelihood of irreparable harm. *See Gladstone v. Waldron & Co.,* 1998 WL 150982, at *2 (S.D.N.Y. Mar. 31, 1998) ("Courts routinely hold that conclusory assertions of defendants' financial weakness do not demonstrate a likelihood of irreparable harm.").

Finally, Plaintiffs' delay in seeking relief demonstrates a reduced need for such drastic, speedy action and undercuts any claim of irreparable harm. Even a delay of months defeats the urgency that a temporary restraining order requires. *Tough Traveler, Ltd. v. Outbound Prods.*, 60

10

F.3d 964, 968 (2d Cir. 1995); *Markowitz Jewelry Co. v. Chapal/Zenray, Inc.*, 988 F. Supp. 404, 407 (S.D.N.Y. 1997). Plaintiffs filed suit on May 22, 2026 and sought no injunctive relief. A party that waits two months after filing suit to seek "emergency" relief has disproved its own emergency. *See Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144–45 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction."); *Christmas House USA, Inc. v. Christmasland Experience LLC*, 2022 WL 17852025, at *2 (E.D.N.Y. Dec. 22, 2022) (finding delay of just over a month supported denial of preliminary injunction); *Magnet Communications LLC v. Magnet Communications, Inc.*, 2001 WL 1097865, at *1 (S.D.N.Y. Sept. 19, 2001) (denying motion after delay of twelve weeks) *The Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989) (delay of three months).

## IV.   PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS.[2]

As mentioned above, Plaintiffs' primary complaint is for breach of contract—*i.e.*, that Defendants breached their alleged contractual obligation to pay Haque a revenue share from January 2026 through present. This contractual claim for monetary damages cannot support a pre-judgment asset freeze. Therefore, Plaintiffs rely on three tag-along claims to support their application: copyright infringement, breach of fiduciary duty, and conversion. None are likely to succeed on the merits, as Popov intends to file a motion to dismiss the Amended Complaint in August.

As set forth in further detail below, Haque's contributions to a single unitary work

---

[2] "Where plaintiff is seeking a 'mandatory injunction [which] is said to alter the status quo by commanding some positive act,' courts sometimes apply a 'heightened standard' in evaluating such requests for relief." *Pivotal Payments, Inc. v. Phillips*, 2014 WL 6674621, at *4 n. 3 (E.D.N.Y. Nov. 25, 2014). The relief sought here could fairly be described as a mandatory injunction, justifying application of this heightened standard.

(*Anime Vanguards*) are not independently copyrightable. This defeats Plaintiffs' copyright infringement claim. Plaintiffs also fail to plead a special relationship between Haque and Defendants that would give rise to a fiduciary duty. Haque was merely a video game developer that received a revenue share in lieu of a salary while rendering developer services to *Anime Vanguards*. Finally, as to the conversion claim, Plaintiffs do not identify any specifically identifiable fund that Defendants allegedly converted. Rather, Plaintiffs plead that Defendants breached their contractual obligation to pay Haque a 20% (or 10%) revenue share. That is not a conversion claim. Because plaintiffs cannot establish a likelihood of success on any claim that could support an asset freeze, Plaintiffs' application must be denied.

### A.    Plaintiffs' Copyright Infringement Claim is Fatally Flawed

To prevail on a copyright infringement claim, Haque must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Peter F. Gaito Architecture, LLC v. Simone Development Corp.*, 602 F.3d 57, 63 (2d Cir. 2010). Haque cannot establish those elements as a matter of law. He therefore necessarily cannot make the showing of likely success required for the extraordinary relief he seeks.

"Copyright protection subsists . . . in original works of authorship," 17 U.S.C. § 102(a), which include "motion pictures and other audiovisual works," *id.* § 102(a)(6). "Authors are not entitled to copyright protection except for 'works of authorship' they create and fix." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 258 (2d Cir. 2015). Thus, an individual's "contribution to an integrated 'work of authorship' such as a film is not *itself* a 'work of authorship' subject to its own copyright protection." *Id.* at 259.

Plaintiffs' copyright claim therefore fails as a matter of law. *Anime Vanguards* is a single, integrated "work of authorship." Haque does not own a copyright in his individual contributions to that unitary work, and he does not allege that he owns or co-owns the copyright in the work

12

itself: the game.

*16 Casa Duse* is directly on point. There, a director hired by a production company conceded that he was not a joint author of the film, but claimed copyright ownership in his individual creative contributions to it. 791 F.3d at 255. The Second Circuit rejected that theory, holding that the film was the relevant "work of authorship" and that copyright did not separately subsist in the myriad artistic contributions incorporated into it. *Id.* at 258. A contrary rule, the court recognized, would create a "legal morass," making "Swiss cheese of copyrights." *Id.* (quoting *Garcia v. Google, Inc.,* 786 F.3d 733 (9th Cir. 2015) (rejecting actress's claim of copyright ownership in her performance in film)).

*Blizzard Entertainment, Inc. v. Lilith Games (Shanghai) Co.*, 2017 WL 2118342 (N.D. Cal. May 16, 2017) applied the same rule to a video game assembled from characters and other contributions supplied by numerous developers and community members. The court held that the game was a "unitary work," not a collection of separately copyrightable contributions: "Heroes do battle in teams on fictional battlefields—together. They do not stand alone in self-contained bubbles." *Id.* at *8. Copyright did not separately subsist in each hero or other game element contributed for integration into the game. *Id.* at *10–11.

The same rule controls here. *Anime Vanguards* is a single, integrated audiovisual work under Section 102(a)(6). Am. Compl. ¶¶ 13, 18-19. Haque's code and other alleged contributions, like the director's contributions in *16 Casa Duse*, the actress's performance in *Garcia*, and the individual heroes and game elements in *Blizzard*, were created for incorporation into that unitary work. Haque Decl. ¶ 4. He does not contend otherwise. They are not separate works of authorship in which copyright independently subsists. Only the author or authors of *Anime Vanguards* itself own the copyright in the game.

Haque does not allege that he is an author or co-author of *Anime Vanguards*. To the contrary, Plaintiffs expressly insist that "*Anime Vanguards* is not a joint work." Plaintiffs' Br. n.2. That concession necessarily forecloses any claim that Haque is a joint author and leaves him asserting copyright only in his individual contributions, precisely the theory rejected by *16 Casa Duse*, *Garcia*, and *Blizzard*. Because those contributions are inseparable parts of the game rather than independent works of authorship, Haque owns no copyright that Defendants could have infringed.

Plaintiffs cannot escape this defect by reversing course and recasting *Anime Vanguards* as a joint work. Joint authorship requires, among other elements, mutual intent to be co-authors, assessed through objective indicia, particularly control over the work. *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998); *Childress v. Taylor*, 945 F.2d 500, 507–08 (2d Cir. 1991). Plaintiffs allege no such mutual intent. Instead, they emphasize Defendants' exclusive administrative and operational control over the Game. Haque Decl. ¶ 14. And even if Haque *were* a joint author, "[o]ne joint owner cannot be liable for copyright infringement to another joint owner." *16 Casa Duse*, 791 F.3d at 255 (citation omitted).

The copyright claim therefore fails. *Anime Vanguards* is a unitary work, and Haque's alleged contributions do not give rise to separate copyrights. Plaintiffs expressly disclaim joint authorship; the allegations would not support joint authorship in any event; and even if they did, a joint author cannot sue a co-author for infringement. Haque thus identifies no copyright interest that Defendants could have infringed and cannot make the showing of likelihood of success required for the extraordinary relief he seeks.

**B.    Plaintiffs Do Not Plead a Special Relationship Giving Rise to Fiduciary Duties.**

Haque does not allege any special relationship with Defendants that would give rise to

fiduciary obligations. While Haque sprinkles the word "partnership" throughout his Amended Complaint, he does not actually plead the elements required to establish a partnership under New York law. A partnership requires (1) the sharing of profits *and* losses; (2) joint control and management; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge; and (4) the parties' intention to be partners." *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) (emphasis added). Loss-sharing is indispensable, and its absence alone is fatal. *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317 (1958); *Slabakis v. Schik*, 164 A.D.3d 454, 455 (1st Dep't 2018).

Plaintiffs' partnership theory fails because they never actually plead the partnership they invoke. A partnership is a specific legal relationship with identifiable members, terms, and mutual obligations. Yet the Amended Complaint never identifies who the partners were (Haque and both Defendants? Haque and Popov alone? All individuals with a revenue share in the Game?), what each partner contributed or was obligated to contribute, how profits *and losses* were to be shared, or what duties the partners owed one another. It pleads no partnership agreement, no agreed term, no capital accounts, and no allocation of authority or responsibility among the supposed partners. Those omissions are dispositive: a plaintiff cannot establish a partnership without alleging its essential terms, and conclusory invocations of the word "partner" do not supply them. *See Kidz Cloz*, 320 F. Supp. 2d at 171–72 (lacking evidence of mutual intent or agreement to share losses defeated partnership).

The ordinary indicia of a partnership are absent. Plaintiffs plead no partnership tax returns, no joint bank accounts, no shared books, and no authority of any purported partner to bind the others. The lone entity that was ever formed was a *corporation*, not a partnership, and even that "went unused." Haque Decl. ¶ 9. A corporation is the antithesis of the informal

15

partnership Plaintiffs now assert, and its formation cuts against, not for, their theory.

What remains is Haque's own subjective say-so. His "understanding" that the parties "were partners" (*id.* ¶ 7) is a unilateral, self-serving belief that cannot establish the mutual, objectively manifested intent the law requires. Partnership turns on "concrete indicia" of what the parties *did* and outwardly agreed to, not on one participant's private characterization. *ACLI Gov't Sec., Inc. v. Rhoades*, 813 F. Supp. 255, 257 (S.D.N.Y.), aff'd sub nom. Gov't v. Rhoades, 14 F.3d 591 (2d Cir. 1993). Because Plaintiffs neither identify the terms of the partnership nor allege the objective indicia of one, they cannot show a likelihood of success.

Equally fatal, plaintiffs fail to plead loss sharing. A revenue share is not a partnership. N.Y. P'ship Law § 11(4)(b); *Scott v. Rosenthal*, 2000 WL 1863542, at *3 (S.D.N.Y. Dec. 20, 2000). A loss-sharing agreement requires joint liability for the venture's debts to third parties. *See, e.g.*, *Lebedev v. Blavatnik*, 193 A.D.3d 175, 186 (1st Dep't 2021) (party did not "satisf[y] the loss sharing requirement" by claiming "he stood to lose his initial capital investment" or agreed to "fund the business's ongoing expenses," because that "merely shows that plaintiff agreed to act in concert . . . to achieve some stated economic objective, which by itself creates no more than a contractual obligation." (citations omitted)). Haque does not plead this. Indeed, if the Court freezes $8 million in assets and there are insufficient revenues to pay the developers and operating costs of the Game, is Haque admitting that he would shoulder a personal obligation for these "partnership" liabilities and expenses? That would be the reality if he were in fact a partner. We urge the Court to question Haque regarding this at the upcoming hearing.

Furthermore, Plaintiffs' own allegations that defendants unilaterally removed Haque and retained sole control of the Game (*id.* ¶ 14) negates any notion that Haque had joint control and management of the alleged partnership. In short, merely working together, as Plaintiffs assert

16

here, creates no fiduciary duty. *Next/Ingle Holdings, LLC v. GSPP HOLDCO III, LLC*, 2026 WL 1398474, at \*9 (S.D.N.Y. May 19, 2026) (Daniels, J.).

### C.   Plaintiffs Do Not Adequately Plead a Conversion Claim

Conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex.*, 87 N.Y.2d 36, 44 (1995) (quotation omitted). Conversion of money requires a "specifically identifiable" fund, not a general debt, and will not lie where the claim merely recasts a contract claim. *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 883 (1982); *Priolo Commc'ns, Inc. v. MCI Telecommunications Corp.*, 248 A.D.2d 453, 454 (1998) ("The plaintiff's claim alleging conversion merely restates its cause of action to recover damages for breach of contract and does not allege a separate taking.").

Plaintiffs' theory is that Roblox's payout system "earmarked" Haque's percentage before distributing the remainder, making it a segregable res. Haque Decl. ¶¶ 11-12, 18. But that theory collapses on Plaintiffs' own allegations. Before his removal, Haque was paid the percentage allocated to him, so there was no withheld fund. After January 14, 2026, nothing was thereafter "earmarked" or segregated for him at all because his payout was set to zero (*id.* ¶ 14). The funds flowed in their entirety into Defendants' general accounts, and Plaintiffs seek an amount *contractually* owed (id. ¶¶ 14, 18), which is the antithesis of a discrete, identifiable res. A claim to a percentage of another party's general revenue is merely a debt and fails because "it merely recasts [Plaintiffs'] breach of contract claim." *Nasso v. Bio Reference Lab'ys, Inc.*, 892 F. Supp. 2d 439, 454 (E.D.N.Y. 2012); *see Daub v. Future Tech Enter., Inc.*, 65 A.D.3d 1004, 1006, 885 N.Y.S.2d 115 (2009) ("[T]he mere right to payment cannot be the basis for a cause of action

17

alleging conversion."); *see also supra* Point II (describing nature of relief sought).[3]

## V.     THE EQUITIES AND PUBLIC INTEREST WEIGH DECISIVELY AGAINST RELIEF.

Plaintiffs fail to make the requisite showing that the balance of hardships tips squarely in their favor. Freezing more than $8 million in revenue would not preserve the status quo; it would halt operations and shut the Game down, destroying the very thing Plaintiffs claim to want to preserve. Furthermore, such a freeze would have a devastating effect on non-parties. If the Court prohibits all distributions from the Roblox payout system for *Anime Vanguards*, non-parties will not receive their payouts. Popov Decl. ¶ 8. Haque has no right to restrain Defendants from paying developers and other service providers that are crucial to the ongoing operation of the Game. Additionally, freezing $8 million—where Plaintiffs only allege approximately $357,700 in damages to date, Popov Decl. ¶ 7—is completely unjustified.

In comparison, Plaintiffs have not demonstrated how they suffer any *immediate* hardship absent the relief they seek. "Their only 'hardship' is the possibility that there will be no assets to satisfy a judgment in the future, a concern that is mere speculation without basis." *Levy*, 2015 WL 170442, at *10. *Leadenhall* confirms that collectability worries do not authorize a freeze. *See Leadenhall*, 171 F.4th at 164 (vacating freeze even where the district court found the defendants could not satisfy, and intended to frustrate, a judgment).[4]

Finally, the public interest is not served by letting a direct-competitor assignee use an "emergency" motion to choke a rival. Plaintiffs' own discovery requests (discussed below) give the objective away: an interrogatory demanding "all US-based assets," account-tracing requests

---

[3] We do not here address Plaintiffs' breach of contract, breach of the covenant of good faith and fair dealing, declaratory judgment, and unjust enrichment claims, which fail for the reasons that will be set out in Popov's forthcoming motion to dismiss.

[4] Plaintiffs also provide no basis for not having to post a bond.

reaching every bank, brokerage, and crypto wallet, and a seven-day response fuse that appears nowhere in the Rules.

## VI.    PLAINTIFFS' EXPEDITED DISCOVERY REQUESTS ARE IMPROPER

"Courts in this circuit employ two tests to determine whether to grant expedited discovery." *Levy*, 2015 WL 170442, at *6. "The first is a 'reasonableness standard.'" *Id.* (citing *N. Atl. Operating Co. v. Evergreen Distributors, LLC,* 293 F.R.D. 363, 367 (E.D.N.Y. 2013) (party seeking discovery must "prove that the requests are reasonable under the circumstances")). The second test requires a showing of: "(1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *Id.* (citing *Notaro v. Koch,* 95 F .R.D. 403, 405 (S.D.N.Y. 1982)).

Plaintiffs have not met the burden for expedited discovery under either standard.[5] The four-factor test "largely mirrors the test for a preliminary injunction." *Id.* Plaintiffs fail to meet those factors for the reasons stated above: they have not shown irreparable injury or likelihood of success on the merits, both of which are necessary to receive this type of relief. *See Notaro,* 95 F.R.D. at 405.

"These same flaws in the plaintiffs' arguments also render their request unreasonable under the circumstances, thus foreclosing relief under the other test used in this circuit." *Levy*, 2015 WL 170442, at *11. Indeed, Plaintiffs are essentially seeking expedited asset discovery that would only be potentially available post-judgment, such as:

- The identity of all US-based assets owned or controlled by Defendants, including real property, financial accounts, investment accounts, cryptocurrency holdings,

---

[5] Plaintiffs also improperly attempt to propound discovery on defendant Acuña despite the fact that he has not been served and this Court lacks personal jurisdiction over him in the Philippines.

and interests in any business entity (Interrogatory No. 2);

- The identity of every Financial Account into which Game Revenue has been transferred, credited, deposited or converted from January 14, 2026 to the present, including the account holder name, institution or platform, account number or wallet address, and country of the account (Interrogatory No. 1);

- A Rule 45 subpoena to Roblox for the complete payout history dating back to November 1, 2024

- Every transfer of Game Revenue into any Foreign Financial Account from January 14, 2026 to the present (Interrogatory No. 3);

- Every Roblox user account and Roblox group account through which Defendants have received or distributed Game Revenue from January 14, 2026 to the present (Doc. Req. No. 1)

- All Documents and Communications relating to all Developer Exchange (DevEx) transaction records and Robux exchange records reflecting the conversion of Robux to any other currency from January 14, 2026 to the present, including the amount, date, Financial Account, and individual or entity receiving the converted Robux (Doc. Req. No. 2)

- All Documents and Communications relating to Game Revenue generated by *Anime Vanguards* from January 14, 2026 to the present (Doc. Req. No. 3)

- All Documents and Communications relating to any plan, proposal, offer, negotiation, or discussion from January 14, 2026 to the present to sell, transfer, assign, or wind-down *Anime Vanguards* or the Roblox group associated with *Anime Vanguards* (Doc. Req. No. 4)

This is an improper attempt at expediting full-blown asset discovery of the kind reserved for a judgment creditor. Moreover, it is very suspect that a direct competitor is asking for this sensitive and confidential information, particularly confidential documents and communications concerning Defendants' business plans. They are instead a vehicle to hand a direct competitor a window into its rival's finances and operations. As such, they must be denied.

## **CONCLUSION**

For the foregoing reasons, defendant Popov respectfully requests that the Court deny Plaintiffs' *ex parte* motion for a temporary restraining order, deny the requested preliminary

injunction and expedited discovery, and grant such other and further relief as the Court deems just and proper. In the event the Court grants Plaintiffs' application for an asset freeze, Popov requests that Plaintiffs be required to post an $8,150,480 bond.


DATED: July 29, 2026

FRANKFURT KURNIT KLEIN + SELZ PC


By: */s/ Caren Decter*
    Caren Decter
    Jeremy Goldman
    Peter A. Devlin
    Regina Gerhardt

28 Liberty Street
New York, New York 10005
(212) 980-0120
cdecter@fkks.com
jgoldman@fkks.com
pdevlin@fkks.com
rgerhardt@fkks.com

*Attorneys for Defendant Vladislav Popov*

21

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(c), the undersigned certifies that this Memorandum of Law, excluding the caption, index, table of contents, table of authorities, signature blocks, and required certificates, consist of 6,424 words, which was determined using Microsoft Word's word count function.

*/s/ Peter Devlin*

Peter A. Devlin

22