UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BOSS STUDIO LLC, a Wyoming LLC; and REHAAB HAQUE, an individual,<br><br>  Plaintiffs,<br><br>  -against-<br><br>VLADISLAV POPOV, an individual; and ANDREI ACUÑA, an individual,<br><br>  Defendants. | Case No.: 1:26-cv-04323-GBD |

**DEFENDANT VLADISLAV POPOV'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION FOR SANCTIONS UNDER
28 U.S.C. § 1927 AND THE COURT'S INHERENT POWERS**

FRANKFURT KURNIT KLEIN + SELZ, PC
Caren Decter
Jeremy Goldman
Peter A. Devlin
Regina Gerhardt
28 Liberty Street, 35th Fl.
New York, NY 10005
(212) 980-0120
cdecter@fkks.com
jgoldman@fkks.com
pdevlin@fkks.com
rgerhardt@fkks.com

*Attorneys for Defendant Vladislav Popov*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS .......................................................................................................3

     A.    Plaintiffs File a Secret Motion To Freeze a Competitor's Revenue. .......................3

     B.    The TRO Hearing Exposes the Absence of an Emergency, and the Court Denies Plaintiffs' Application in Full. ....................................................................4

ARGUMENT...........................................................................................................................6

I.    AN AWARD OF ATTORNEYS' FEES AND COSTS IS WARRANTED UNDER § 1927 AND THE COURT'S INHERENT POWERS .........................................6

     A.    Plaintiffs Had No Factual Basis to Proceed *Ex Parte* or to Seek Emergency Relief..............................................................................................8

     B.    Plaintiffs' Requested $8+ Million Asset Freeze Was Foreclosed by Controlling Law. .................................................................................................10

     C.    Plaintiffs' Delay Independently Negated Any Claim of Emergency.....................11

     D.    The Scope and Competitive Nature of the TRO Application Confirm Bad Faith. ................................................................................................................12

II.    POPOV SHOULD RECOVER THE ATTORNEYS' FEES AND COSTS INCURRED IN RESPONDING TO THE *EX PARTE* TRO APPLICATION .................14

CONCLUSION......................................................................................................................15

CERTIFICATION .................................................................................................................16

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agee v. Paramount Communications, Inc.*,
    869 F. Supp. 209 (S.D.N.Y. 1994) ........................................................................................8

*Eisemann v. Greene*,
    204 F.3d 393 (2d Cir. 2000)...................................................................................................7

*Enmon v. Prospect Capital Corp.*,
    675 F.3d 138 (2d Cir. 2012)...........................................................................................6, 13

*Goodyear Tire & Rubber Co. v. Haeger*,
    581 U.S. 101 (2017)..............................................................................................................14

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters*,
    415 U.S. 423 (1974)................................................................................................................8

*Leadenhall Capital Partners LLP v. Advantage Capital Holdings LLC*,
    171 F.4th 155 (2d Cir. 2026) ..............................................................................................10

*People of State of New York v. Operation Rescue National*,
    80 F.3d 64 (2d Cir. 1996)......................................................................................................6

*Ransmeier v. Mariani*,
    718 F.3d 64 (2d Cir. 2013).....................................................................................................6

*Tucker Anthony Realty Corp. v. Schlesinger*,
    888 F.2d 969 (2d Cir. 1989)...................................................................................................8

**Statutes & Rules**

28 U.S.C. § 1927 ............................................................................................................ *passim*

Local Fed. Civ. P. 6.1 ..............................................................................................................8

Fed. R. Civ. P. 26.............................................................................................................4, 12

Fed. R. Civ. P. 65.............................................................................................................8, 9

## PRELIMINARY STATEMENT

This motion seeks to recover the costs and fees incurred by defendant Popov[1] in responding to Plaintiffs' unsuccessful *ex parte* TRO motion, which sought to restrain—without any legal or factual basis—$8+ million of *Anime Vanguards*' (the "Game") revenues. This improper application was a blatant attempt by Plaintiff Boss Studio—which operates the "primary competitor" of *Anime Vanguards*, Ha Decl. (ECF No. 28) ¶ 5—to weaponize emergency judicial process against a business rival to freeze its operating revenue. Boss Studio itself has no underlying claim arising from the development of *Anime Vanguards*. When the Court asked, "Why does [Boss Studio] have a motivation to be part of this lawsuit?", Plaintiffs' counsel had no answer except that Boss Studio is now "business partners" with Plaintiff Rehaab Haque, the Game's allegedly aggrieved former developer. Decter Decl. Ex. A ("Tr.") at 40:21-41:2.[2]

There was no basis for this emergency motion, and certainly no basis for Plaintiffs to proceed *ex parte*. The Court denied Plaintiffs' application in full. The Court found that Plaintiffs had no "basis to argue that there is evidence that assets are being dissipated or moneys intentionally being placed out of the reach of plaintiffs and to avoid their lawsuit." *Id.* at 44:17-19. The Court thus held that Plaintiffs' request was "inappropriate for a TRO or preliminary injunction on these facts" and that there was no likelihood that Plaintiffs would suffer irreparable injury if an injunction was not issued. *Id.* at 44:10-13. The Court further concluded that the balance of hardships "clearly" favored Defendants. *Id.* at 44:25.

---

[1] Defendant Andrei Acuña has not yet been served with the Amended Complaint.

[2] References to "Tr." refer to the transcript of the July 30, 2026 hearing on Plaintiffs' *ex parte* TRO application, which is attached as Exhibit A to the Declaration of Caren Decter ("Decter Decl."), filed herewith.

The Court was rightfully "concerned" when Plaintiffs moved *ex parte* to seek this extraordinary and unwarranted relief. *Id.* at 44:20-23. Section 1927 authorizes an award against the attorneys who created this unnecessary emergency proceeding. The Court's inherent powers authorize the same compensatory award against the moving party, their counsel, and the responsible firms. The circumstances here strongly support an inference of bad faith. Boss Studio was a named movant, supplied its CEO's declaration to support the supposed emergency, and stood to benefit directly from freezing the operating revenue and obtaining confidential financial information of its principal rival. That inference is particularly strong given Boss Studio's posture here: it did not develop *Anime Vanguards* but rather operated *Anime Vanguards'* rival video game, was not a party to the underlying compensation arrangement, and entered the dispute only as Haque's assignee. The absence of any factual emergency combined with Boss Studio's competitive interest, the secrecy of the application, the destructive scope of the requested freeze, and the demand for accelerated competitor-sensitive discovery, support a finding that the application was filed in bad faith to obtain improper competitive and litigation leverage.

Plaintiffs' bad-faith TRO application imposed substantial and unwarranted burdens on Defendant Popov and undersigned counsel. Undersigned counsel, having learned of this application by happenstance two days before the scheduled hearing, were left to scramble to investigate the allegations, coordinate with Mr. Popov abroad, prepare opposition papers, and travel from out-of-state to appear for the TRO hearing. Decter Decl. ¶¶ 8-13; Tr. 30:12-18. Plaintiff Boss Studio LLC[3] and its counsel should now bear the costs and fees that their

---

[3] Defendant is not seeking sanctions against plaintiff Rehaab Haque, because we understand that plaintiff Boss Studio is funding this litigation. That said, the fact that Haque was a co-movant is egregious given his representation that he assigned all claims to Boss Studio.

2

manufactured emergency imposed on Defendants.

<u>STATEMENT OF FACTS</u>

**A.      Plaintiffs File a Secret Motion To Freeze a Competitor's Revenue.**

The underlying dispute arose when Haque's role on *Anime Vanguards* ended in January 2026. Am. Compl. (ECF No. 20) ¶ 27. Counsel for Plaintiffs and Defendants have been in frequent communication since early April regarding this dispute. Decter Decl. ¶¶ 3-5. Plaintiffs sent Popov's counsel a draft complaint on April 28, 2026, filed suit on May 22, 2026, and then filed an Amended Complaint on July 14. *Id.* ¶ 4. Popov's counsel accepted service of the Amended Complaint, and the parties agreed to extend Popov's response deadline to August 28. *Id.* ¶ 4.

Days later, on July 24, Plaintiffs filed their *ex parte* TRO application—without providing any notice to Popov or his counsel. *Id.* ¶¶ 5-7. Undersigned counsel discovered the filing via a happenstance docket check on July 28, only two days before the scheduled hearing. *Id.* ¶ 8.

Without any legal or factual basis, Plaintiffs' TRO application asked the Court to restrain up to $8,150,480 of the revenue "generated by or attributable to" *Anime Vanguards*. Mot. (ECF No. 25) at 1–2; Proposed Order (ECF No. 27) at 1. Plaintiffs asked to post no bond or only a nominal bond. Pls.' Mem. (ECF No. 26) at 17–18.

In opposition, Popov explained that freezing $8,150,480 would leave no funds to pay developers and operate the Game. Popov Decl. (ECF No. 38) ¶¶ 5, 8–9. At the hearing, Plaintiffs' counsel acknowledged that the proposed order could be read to freeze "everything" and conceded that this was "maybe . . . improper drafting on our part." Tr. 41:5–16. Counsel further conceded that the Supreme Court's decision in *Grupo Mexicano* "does not allow injunctive relief for a basic contract claim"; Plaintiffs thus recharacterized the payment dispute as copyright, conversion, and fiduciary-duty claims. *Id.* at 11:20–12:7.

3

Plaintiffs coupled the request for an asset freeze with a demand for immediate and expedited discovery prior to a Rule 26(f) conference or service on defendant Andrei Acuña. They sought information concerning all of Defendants' U.S. assets, bank and brokerage accounts, cryptocurrency holdings, transfers, Roblox payout records, revenues, operating information, and any plans to sell or wind down *Anime Vanguards*, with responses due in seven days. Levy Decl. (ECF No. 30) ¶ 4 & Exs. 1–5; Def.'s Opp. (ECF No. 37) at 19–21. That information was not necessary to preserve an identified asset at risk. It was sought to discover whether Plaintiffs could substantiate the risk they had already represented as fact.

Boss Studio's role in the TRO application is especially troubling. Boss Studio owns *Anime Last Stand*, which Boss Studio's CEO himself identifies as *Anime Vanguards*' "primary competitor," Ha Decl. (ECF No. 28) ¶ 5, and further claims to have acquired Haque's claims, Am. Compl. (ECF No. 20) ¶ 4. Boss Studio has no independent interest in the underlying payment dispute. When the Court asked Plaintiffs' counsel at the hearing why Boss Studio had a motivation to participate in the lawsuit, counsel merely responded that Haque had assigned claims to Boss Studio and that they were now "business partners." Tr. 40:21-41:2.

**B.    The TRO Hearing Exposes the Absence of an Emergency, and the Court Denies Plaintiffs' Application in Full.**

At the start of the TRO hearing, the Court asked Plaintiffs' counsel to explain their basis for seeking an *ex parte* restraining order. Plaintiffs' counsel initially suggested that there was a "serious concern that the defendants, if they knew about this motion, . . . would empty their U.S. Roblox accounts and take that money to foreign bank accounts in Sweden and the Philippines." Tr. at 2:22-3:3. When the Court asked Plaintiffs' counsel whether they had "any reason to believe that's occurring", Plaintiffs' counsel admitted, "We don't know [that] it's been occurring." *Id.* at 3:8-11.

Plaintiffs' counsel further admitted that Plaintiffs lacked any evidence to support the $8 million figure they were seeking to freeze. The Court highlighted that Haque "agreed that his compensation would be 20 percent" and questioned why, in light of this agreement, Plaintiffs would be entitled to freeze all $8 million of the Game's projected profits. *Id.* at 7:22-11:19. Plaintiffs' counsel quickly backtracked, stating "[I]f we do just freeze the 20 percent, that is still an acceptable outcome for us as long as there is something to recover from." *Id.* at 11:12-19; 22:8-17. Plaintiffs' counsel admitted that their real concern "is that at the end of [the] case, there will be nothing left" to satisfy a judgment. *Id.* at 22:16-17. The Court responded, "Right. There's always that concern in every litigation. . . . And not everybody's entitled to preliminary injunction just to hold assets so you can get them at the end of your litigation." *Id.* at 22:18-23:1.

The Court repeatedly asked "why this case is any different from any run-of-the-mill case in that you get the judgment and you enforce that judgment for whatever you get." *Id.* at 22:21-24. Plaintiffs' counsel admitted that Plaintiffs had no evidence that Defendants had taken steps to place money beyond reach, and had no direct evidence that any supposed scheme was underway. *Id.* at 22:17–25:15, 29:15–24. The Court also questioned why Plaintiffs sought *ex parte* relief months after the dispute arose and after communicating with defense counsel when they "had no basis to allege [Defendants] have done anything inappropriate during this litigation." *Id.* at 26:21–27:3. Plaintiffs' counsel's sole retort was that Defendants had made certain changes to the Game in February and May 2026, but also admitted that these were design choices Boss Studio itself had made with respect to its rival game. *Id.* at 25:21–26:1, 27:4-9; Ha Decl. (ECF No. 28) ¶ 7. Plaintiffs' counsel could not explain why changes that occurred back in February and May created an emergency in July that would warrant extraordinary relief.

The Court's ruling on Plaintiffs' TRO and injunction application was unequivocal:

5

> I think this is inappropriate for a TRO or preliminary injunction on these facts. . . .
> *I don't even see a basis to argue* that there is evidence that assets are being
> dissipated or moneys intentionally being placed out of the reach of plaintiffs and
> to avoid their lawsuit. So I don't think that this is appropriate either for an *ex
> parte* application. . . . [T]he balance of hardships clearly are in defendants' favor
> if an injunction is issued.

Tr. at 44:10-25 (emphasis added).

The Court further held that Defendants' residence abroad, standing alone, did not justify

restraining their U.S. assets. *Id.* at 45:10-14. The Court denied the TRO and preliminary

injunction, leaving Plaintiffs free to litigate their claims through the ordinary process. *Id.*; Order

(ECF No. 40).

## ARGUMENT

### I.    AN AWARD OF ATTORNEYS' FEES AND COSTS IS WARRANTED UNDER § 1927 AND THE COURT'S INHERENT POWERS

Section 1927 permits the Court to require an attorney who "multiplies the proceedings in

any case unreasonably and vexatiously" to pay the "excess costs, expenses, and attorneys' fees

reasonably incurred because of such conduct." 28 U.S.C. § 1927. The Court may likewise

exercise its inherent powers to assess fees against "a party or an attorney who has 'acted in bad

faith, vexatiously, wantonly, or for oppressive reasons.'" *Ransmeier v. Mariani*, 718 F.3d 64, 68

(2d Cir. 2013) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991)). An award under

§ 1927 compared to an award under the court's inherent power differs only in that the former is

made against attorneys while the latter can also be made against the attorneys, the parties, or

both. *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 144 (2d Cir. 2012).

Under either authority, sanctions require particularized findings that the challenged

position lacked a colorable basis and was advanced in bad faith—that is, for an improper purpose

such as harassment or delay. *Id.* at 143–44. Bad faith may be inferred where conduct is "so

completely without merit as to require the conclusion that [it] must have been undertaken for

6

some improper purpose . . . ." *Id.* at 143 (quotations omitted); *see also People of State of New York v. Operation Rescue National*, 80 F.3d 64, 72–73 (2d Cir. 1996) (affirming § 1927 sanction where counsel's meritless conduct unnecessarily and vexatiously prolonged the proceeding).

As set forth below, the Second Circuit and courts in this District have awarded sanctions arising from counsel's bad-faith application for an *ex parte* restraining order. The Court should do the same here. Plaintiffs deliberately withheld notice from counsel with whom they had been communicating for months and sought, without a good faith basis, to freeze more than $8 million of a competitor's operating revenue. Their emergency application forced Popov and his counsel to investigate the allegations, prepare opposition papers, submit supporting evidence and declarations, and travel from out-of-state to appear for a TRO hearing that should never have occurred—all on a compressed schedule. Those are the excess proceedings and expenses that Section 1927 and the Court's inherent powers authorize the Court to shift.

We recognize that an unsuccessful or aggressive motion is not, without more, sanctionable. *See Eisemann v. Greene*, 204 F.3d 393, 396–97 (2d Cir. 2000). However, the challenged conduct here is more egregious. Plaintiffs deliberately decided to invoke *ex parte* Rule 65(b) procedures, to represent conjecture as an imminent threat, and to force an emergency proceeding—all while knowing that they lacked the specific facts required to dispense with notice and to succeed on their application. The fact that Popov's counsel discovered the application and prevented the requested freeze from issuing does not eliminate the unnecessary costs caused by Plaintiffs' misuse of the emergency-relief process, nor does it cure Plaintiffs' misconduct.

Accordingly, and for the reasons set forth below, an award of attorneys' fees is warranted.

7

### A.    Plaintiffs Had No Factual Basis to Proceed *Ex Parte* or to Seek Emergency Relief.

Rule 65(b)(1) permits relief without notice only where "specific facts" clearly show that "immediate and irreparable injury" will occur before the adverse party can be heard and counsel certifies why notice should not be required. These "stringent restrictions . . . reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 438–39 (1974). Local Civil Rule 6.1(d) likewise requires a "clear and specific showing" of good and sufficient reasons to proceed without notice. And even with notice, emergency relief still requires the applicant make a factual showing of irreparable harm, and it is black letter law that "[a] monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989).

Courts in this District have awarded fees incurred in responding to improper *ex parte* TRO applications. In *Agee v. Paramount Communications, Inc.*, 869 F. Supp. 209 (S.D.N.Y. 1994), for example, the court awarded the defendant the fees incurred responding to an *ex parte* TRO pursued without proper notice and on a factual premise that did not withstand scrutiny. *Id.* at 210–13. The court found the conduct "in bad faith, misleading, and without merit," contrary to Rule 65(b), and inconsistent with the fair dealing expected in this District. *Id.* at 211–12.

The same defect in *Agee* is present here: Plaintiffs withheld notice despite months of communications with defense counsel and invoked emergency procedures while conceding that they had no evidence of the threatened dissipation on which the request depended. Their papers identified no threatened transfer, unusual post-suit transaction, insolvency, concealment, fraudulent conduct, or statement by either Defendant suggesting an intent to frustrate a judgment.

Instead, Plaintiffs relied on ordinary distributions of Game revenue to individuals who happen to live abroad and speculation that routine game-design decisions reflected a plan to extract short-term revenue and place assets beyond Plaintiffs' reach.

The hearing removed any doubt about the absence of a factual predicate for Plaintiffs' "emergency" application. When the Court asked if there was reason to believe Defendants were emptying accounts, Plaintiffs' counsel admitted: "We don't know it's been occurring." Tr. at 3:8-13. When pressed for evidence that Defendants were taking steps to place money beyond Plaintiffs' reach, counsel conceded that Plaintiffs merely "presume[d]" where the funds went. *Id.* at 23:21–24:3. Counsel then admitted: "We have no direct evidence." *Id.* at 24:19–20. And when the Court explained that Plaintiffs could not rely on speculation, counsel responded by requesting expedited discovery so Plaintiffs could determine whether the feared conduct was occurring. *Id.* at 24:21–25:15.

That turns Rule 65(b) on its head. *Ex parte* relief is not a vehicle to obtain discovery into whether an emergency might exist. Plaintiffs were required to possess specific facts showing that immediate injury would occur before Defendants could be heard. They instead sought to deprive Defendants of notice based on a hypothesis that they hoped discovery might later substantiate.

The Court accordingly rejected the premise of the application. As the Court explained, "You can't just guess that. You say that you don't know. If you don't know, I can't use that as a basis for giving you an injunction." *Id.* at 25:10–12. The Court found no evidence Defendants were dissipating assets or intentionally placing money beyond Plaintiffs' reach and concluded that the application was not appropriate for either *ex parte* treatment or a TRO or preliminary injunction. *Id.* at 44:10–45:7. It could not "even see *a basis to argue* that there is evidence that assets are being dissipated." *Id.* at 44:16-17 (emphasis added).

9

Because Plaintiffs had no factual basis to proceed *ex parte* or to seek emergency relief, an award of attorneys' fees is warranted.

### B.      Plaintiffs' Requested $8+ Million Asset Freeze Was Foreclosed by Controlling Law.

Plaintiffs' TRO application was not merely unsupported by evidence. The principal relief that Plaintiffs sought—a freeze of more than $8 million in Defendants' revenue to secure a potential monetary recovery—was foreclosed by controlling Supreme Court and Second Circuit precedent.

In *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, the Supreme Court held that a federal court may not preliminarily restrain a defendant's use of assets in which the plaintiff claims no lien or equitable interest merely to preserve funds that might later satisfy a money judgment. 527 U.S. 308, 310, 320, 330 (1999). An unsecured claimant has no right before judgment to interfere with a defendant's property simply because those assets may be needed to satisfy a future award. *Id.* at 321, 330; *see also Leadenhall Capital Partners LLP v. Advantage Capital Holdings LLC*, 171 F.4th 155, 163-64 (2d Cir. 2026) (equitable labels do not convert general interest in receiving compensation into equitable interest in particular asset).

Plaintiffs sought precisely the relief that controlling caselaw prohibited. They sought to restrain any revenue "generated by or attributable to" the Game, up to $8,150,480. Proposed Order (ECF No. 27) at 1–2. They identified no lien on those funds and no preexisting ownership interest in any particular account or asset. The requested amount was instead an estimate of what Plaintiffs claimed they might ultimately recover based on Haque's alleged share of Game revenue.

Counsel effectively acknowledged the problem at the hearing. When the Court asked about the legal basis for the freeze, counsel conceded that "the Supreme Court decision in *Grupo*

10

*Mexicano* does not allow injunctive relief for a basic contract claim." Tr. at 11:24–12:2. Counsel then argued that the same payment dispute could support an asset freeze because Plaintiffs had also pleaded copyright, conversion, and fiduciary-duty claims. *Id.* at 12:2–12:5. But the Court repeatedly questioned that effort to recharacterize the dispute, observing that Plaintiffs' "creative legal theories" arose from an arrangement under which Haque agreed to receive a percentage of revenue as compensation. *Id.* at 8:24–15:8, 44:13-14. The Court ultimately found the case did not "merit[] any different analysis than a standard contract dispute . . . ." *Id.* at 44:14-15.

Thus, even apart from the absence of any emergency, the requested freeze lacked a colorable legal foundation. Plaintiffs sought to restrain general operating revenue to secure a potential award of money, without identifying any lien or equitable interest in the particular assets to be frozen. Controlling precedent barred that relief, and Defendants should not be forced to bear the expense of responding to Plaintiffs' baseless TRO application.

### C.      Plaintiffs' Delay Independently Negated Any Claim of Emergency.

Plaintiffs' own timing further demonstrates that no emergency justified their *ex parte* TRO application. Haque's relationship with *Anime Vanguards* ended in January 2026. Am. Compl. (ECF No. 20) ¶ 27. Plaintiffs commenced this action in May. The game-design and monetization decisions they invoked as evidence of supposed dissipation occurred no later than May. Haque Decl. (ECF No. 29) ¶¶ 22, 26, 29. Yet Plaintiffs waited until late July to seek emergency relief.

During that period, Plaintiffs and their counsel were in communication with Defendants' counsel. Decter Decl. ¶¶ 3-5. Nothing prevented Plaintiffs from providing notice, requesting an ordinary briefing schedule, or seeking a prompt conference with all parties present. Instead, Plaintiffs filed secretly and left defense counsel to discover the application by chance. *Id.* ¶¶ 6-7.

Nor did Plaintiffs identify any new transaction, transfer, statement, or change in

11

Defendants' conduct immediately preceding the application. The Court repeatedly questioned the purported urgency. It noted that the dispute had existed for months, that the lawsuit had already been pending, and that Plaintiffs had identified no change in Defendants' ordinary course of conduct that suddenly created a need for relief without notice. Tr. at 26:1–30:8. Plaintiffs' delay was irreconcilable with their claim that injury would occur before Defendants could be heard.

A party that waits months after the events said to create the danger cannot plausibly claim that even minimal notice would itself cause immediate and irreparable harm. The absence of urgency confirms that the *ex parte* designation was a tactical choice.

### D. The Scope and Competitive Nature of the TRO Application Confirm Bad Faith.

The extraordinary scope of the requested relief, viewed in light of Boss Studio's competitive interest, confirms that the TRO application was advanced for an improper purpose.

Boss Studio sought, without notice, an order freezing up to $8,150,480 in revenue generated by its principal competitor. The proposed restraint extended beyond any amount allegedly payable to Haque and would have reached operating revenue used to compensate developers and other contributors and to maintain the Game. Popov Decl. (ECF No. 38) ¶¶ 8-9.

Plaintiffs simultaneously sought expedited discovery, with responses due within seven days, into Defendants' assets, bank and cryptocurrency accounts, Roblox payout history, revenues, transfers, and plans concerning *Anime Vanguards*. That information would include highly sensitive financial and strategic information concerning Boss Studio's competitor. This request came before ordinary discovery and before any Rule 26(f) conference, ostensibly to investigate whether the emergency they had already alleged actually existed.

The relief sought was plainly calculated to impose immediate pressure on *Anime Vanguards*. Had the proposed order issued, Defendants' operating funds would have been

12

restrained before they had any opportunity to be heard, and Boss Studio would have obtained accelerated access to confidential, competitive information.

The Court recognized the resulting imbalance. It found that the balance of hardships "clearly" favored Defendants and rejected an order that could impair the operation of the Game and affect persons who were not parties to the dispute. Tr. at 44:22–45:2. And because Plaintiffs had no evidence of dissipation, the application served no legitimate asset-preservation purpose and was "inappropriate for a TRO or preliminary injunction . . . ." Tr. at 44:10-11.

The inference of bad faith arises from the combined circumstances: Boss Studio's competitive position, the absence of any evidence supporting *ex parte* treatment, the months-long delay, the controlling precedent barring a freeze of general assets, the breadth of the proposed restraint, and the demand for accelerated access to competitively sensitive information. Taken together, those facts show that the application was an attempt to use emergency judicial process to burden, disrupt, and obtain leverage over a commercial rival.

Plaintiffs cannot avoid responsibility merely because Popov's counsel discovered the application and prevented the requested order from issuing. The Second Circuit's decision in *Enmon* is instructive. The Second Circuit affirmed sanctions arising from counsel's bad-faith procurement and prosecution of a TRO, holding that the emergency application multiplied proceedings by forcing the opposing party to respond and seek relief. 675 F.3d at 145–46. The fact that vigilant opposing counsel prevented the TRO from producing its intended effect did not excuse the conduct. *Id.* This case presents the same essential misuse of emergency process, and Plaintiffs' application forced Popov to conduct an immediate factual investigation, prepare opposition papers on a compressed schedule, submit supporting evidence, and appear for an emergency hearing. Those are precisely the excess proceedings and expenses that § 1927 and the

13

Court's inherent powers authorize the Court to shift.

## II.   POPOV SHOULD RECOVER THE ATTORNEYS' FEES AND COSTS INCURRED IN RESPONDING TO THE *EX PARTE* TRO APPLICATION

Plaintiffs' *ex parte* TRO application multiplied the proceedings by creating an unnecessary emergency track. After discovering the application by chance only two days before the hearing, Popov's counsel was required to review Plaintiffs' submissions, investigate the factual allegations, confer with Popov and other knowledgeable persons, research multiple bodies of law, prepare an opposition and supporting declaration within approximately one day, rearrange other professional obligations, prepare for argument, travel from out-of-state, and appear at the July 30 hearing. Decter Decl. ¶¶ 8-13. Popov seeks a compensatory award limited to the fees and expenses caused by Plaintiffs' and counsel's misconduct.

Under the Court's inherent powers, the award may include fees that Popov would not have incurred but for the sanctioned conduct. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108–10 (2017). Popov therefore seeks the reasonable fees and costs incurred from discovery of the application on July 28 through preparation of the opposition and declaration, the July 30 hearing, and the preparation and prosecution of this sanctions motion.

Popov requests that the Court determine entitlement first and permit a supplemental submission of contemporaneous billing records, costs, and a supporting declaration on a schedule set by the Court. Popov's counsel maintains contemporaneous time records and can submit those records, applicable billing rates, and supporting expense documentation. Decter Decl. ¶ 14. The award should be imposed jointly and severally against Boss Studio, Joseph M. Levy, Harry B. Wilson, Markowitz Herbold PC (the "Markowitz Firm"), David M. Peraino, and Peraino Malinowski LLP (the "Peraino Firm") under the Court's inherent powers, and additionally against Mr. Levy, Mr. Wilson, the Markowitz Firm, Mr. Peraino and the Peraino Firm under

14

Section 1927.

## CONCLUSION

For these reasons, the Court should grant Popov's motion and award the attorneys' fees, costs, and expenses incurred with respect to Plaintiffs' TRO application and this motion, in an amount to be established through a supplemental fee submission.

Dated:    New York, New York
          August 11, 2026

**FRANKFURT KURNIT KLEIN + SELZ PC**

By:

Caren Decter
Jeremy Goldman
Peter A. Devlin
Regina Gerhardt

28 Liberty Street, 35th Fl.
New York, New York 10005
(212) 980-0120
cdecter@fkks.com
jgoldman@fkks.com
pdevlin@fkks.com
rgerhardt@fkks.com

*Attorneys for Defendant Vladislav Popov*

15

## **CERTIFICATION**

The undersigned hereby certifies, pursuant to S.D.N.Y. Local Civil Rule 7.1(c), that the foregoing contains 4458 words exclusive of the caption and signature block.

By: */s/ Peter A. Devlin*
Peter A. Devlin
28 Liberty Street, 35th Floor
New York, New York 10005
(212) 980-0120
pdevlin@fkks.com

*Attorney for Defendant Vladislav Popov*

16