**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BOSS STUDIO LLC, a Wyoming LLC; and REHAAB HAQUE, an individual,

Plaintiffs,

-against-

VLADISLAV POPOV, an individual; and ANDREI ACUÑA, an individual,

Defendants.

Case No.: 1:26-cv-04323-GBD

**PLAINTIFFS' OPPOSITION TO DEFENDANT VLADISLAV POPOV'S MOTION FOR SANCTIONS**

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ........ 1
**STATEMENT OF FACTS** ........ 1
I. Haque makes significant contributions to the Game and is made a partner. ........ 2
II. Defendants coerce Haque to reduce his revenue share and then oust him. ........ 3
III. Plaintiffs filed suit, leading defendants to prioritize short-term profit. ........ 4
IV. The TRO Application and Hearing. ........ 6
**LEGAL STANDARD** ........ 7
**ARGUMENT** ........ 7
I. The TRO Application was grounded in colorable legal and factual theory. ........ 7
A. Plaintiffs had a colorable basis to support each element of a TRO. ........ 8
1. Plaintiffs reasonably argued that they are likely to succeed on the merits. ........ 8
a. Plaintiffs offered reasonable arguments in support of their copyright claims. ........ 8
b. Plaintiffs offered reasonable arguments in support of their fiduciary duty claims. ........ 9
c. Plaintiffs offered reasonable arguments in support of their conversion claims. ........ 11
2. Plaintiffs' theory of irreparable harm is colorable. ........ 11
3. Plaintiffs' argument regarding the balance of equities and the public interest were objectively reasonable. ........ 12
B. Plaintiffs had a colorable basis to seek a freeze of defendants' assets. ........ 13
II. Plaintiffs were not acting in bad faith. ........ 14
A. Plaintiffs were not acting in bad faith by proceeding *ex parte*. ........ 15
B. Defendant fails to explain how there was no colorable basis for *ex parte* relief. ........ 16
**CONCLUSION** ........ 19
**CERTIFICATE OF COMPLIANCE WITH L.R. 7.1(c)** ........ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAAG-California, LLC v. Kisana*,
439 F. Supp. 3d 1265 (D. Utah 2020)....13

*Agee v. Paramount Commc'ns, Inc.*,
869 F. Supp. 209 (S.D.N.Y. 1994), *as amended* (July 27, 1995)....18

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
373 F.3d 296 (2d Cir. 2004)....10

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)....7

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010)....8

*Colavito v. New York Organ Donor Network, Inc.*,
8 N.Y.3d 43, 860 N.E.2d 713 (2006)....11

*Coley v. Vannguard Urb. Improvement Ass'n, Inc.*,
No. 12-CV-5565 (PKC) (RER), 2016 WL 7217641 (E.D.N.Y. Dec. 13, 2016)....13

*Enmon v. Prospect Cap. Corp.*,
675 F.3d 138 (2d Cir. 2012)....7, 14, 18, 19

*Gibbs v. Breed, Abbott*,
271 A.D.2d 180, 710 N.Y.S.2d 578 (N.Y. App. Div. 2000)....10

*Gucci Am., Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014)....13, 14

*Kidz Cloz, Inc. v. Officially For Kids, Inc.*,
320 F. Supp. 2d 164 (S.D.N.Y. 2004)....9

*Linseth v. Sustayta*,
No. 1:21-CV-173, 2022 WL 2829740 (D.N.D. June 8, 2022)....13, 14

*LoPresti v. Terwilliger*,
126 F.3d 34 (2d Cir. 1997)....11

*Meinhard v. Salmon*,
249 N.Y. 458, 164 N.E. 545 (1928)....9

*Nemeroff v. Abelson*,
620 F.2d 339 (2d Cir.1980)....................7, 8

*North Am. Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.*,
No. 99 Civ. 4643, 2000 WL 1290608 (S.D.N.Y Sept. 11, 2000)....................10

*Oliveri v. Thompson*,
803 F.2d 1265 (2d Cir. 1986)....................7

*Ransmeier v. Mariani*,
718 F.3d 64 (2d Cir. 2013)....................7

*Schlaifer Nance & Co.*,
F.3d (2d Cir. 1999)....................7

*Schlaifer Nance & Co. v. Est. of Warhol*,
194 F.3d 323 (2d Cir.1999)....................7, 15, 16

*Sierra Club v. U.S. Army Corps of Eng'rs*,
776 F.2d 383 (2d Cir. 1985)....................7

*U.S. Sec. & Exch. Comm'n v. Collector's Coffee Inc.*,
602 F. Supp. 3d 488 (S.D.N.Y. 2022)....................13

*Vanderbilt Univ. v. Dipsters Corp.*,
No. 84 CIV. 7215-CSH, 1986 WL 10471 (S.D.N.Y. Sept. 17, 1986)....................11

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................8

*Yador v. Mowatt*,
No. 19-CV-4128(EK)(RML), 2021 WL 4502442 (E.D.N.Y. Sept. 30, 2021)....................10

*Yurman Design, Inc. v. PAJ, Inc.*,
262 F.3d 101 (2d Cir. 2001)....................8, 9

**Statutes**

17 U.S.C. § 106....................9

17 U.S.C. § 501....................9

17 U.S.C. § 410....................9

28 U.S.C. § 1927....................7, 14

**Rules**

Fed. R. Civ. P. 65....................6, 15

Fed. R. Evid. 801 ....................................................................................................................16

## PRELIMINARY STATEMENT

At the beginning of the year, defendants unilaterally cut their partner, Rehaab Haque, out of their business. They have paid him nothing since. Meanwhile, they have continued to exploit his intellectual property and make millions off of his Roblox game, "*Anime Vanguards*."

After plaintiffs filed suit to recover for this misconduct, they observed defendants making numerous changes to *Anime Vanguards* (or "the Game") that endangered its long-term success for short-term profit. When it appeared that these changes would have lasting and damaging effects, plaintiffs took action. Knowing that defendants live abroad, plaintiffs moved for an *ex parte* restraining order to prevent defendants from moving funds—which rightfully belong to plaintiffs—out of their only known domestic accounts. Plaintiffs believed that, if defendants had notice of the motion, they would drain their accounts before an order could be entered.

Defendant Popov now asks this Court to sanction plaintiffs for even attempting to preserve funds over which they have an equitable interest. Defendant has no case that supports this motion, and resorts to mischaracterizing cases that involve misrepresentations and deception by counsel—an accusation defendant has never made against plaintiffs or their counsel. Lacking any authority for sanctions, this motion is just another attempt by defendant to enrich himself at plaintiffs' expense.

## STATEMENT OF FACTS

*Anime Vanguards* is a tower-defense game on the Roblox platform that, as of the date of the TRO application, had accumulated over 1.8 billion visits and more than 1.8 million favorites. (Compl. ¶ 13.) It is the top-ranked game in its genre on the platform. (*Id.* ¶ 23.) Plaintiff Rehaab Haque is a professional Roblox game developer domiciled in New York. (Compl. ¶ 3, (Decl. of Rehaab Haque in Support of Plaintiffs' *Ex Parte* Motion for Temporary Restraining Order ("Haque Decl. re: Mot. for TRO") (Dkt. 29), ¶ 2.) Defendant Vladislav Popov is

domiciled in Stockholm, Sweden. (Compl. ¶ 5.) Defendant Andrei Acuña is domiciled in the Philippines. (Compl. ¶ 6.) Plaintiff Boss Studio LLC is the assignee of all claims arising from the facts alleged in plaintiffs' complaint (though not the holder of the copyrights at issue). (Compl. ¶ 4.)

## I. Haque makes significant contributions to the Game and is made a partner.

Defendants engaged Haque on September 9, 2024, when the Game had collapsed from approximately 340,000 concurrent users to fewer than 5,000, threatening its survival. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 3.) Haque was not an employee: defendants paid no payroll taxes, withheld no income taxes, and provided no benefits. (*Id.*) Working independently, using his own equipment and setting his own hours, Haque created more than 50 core game systems and mechanics, over 130 original visual effects for in-game units, the underlying code for more than 270 additional visual effects, game mechanics for more than 40 in-game units, and visual effects for more than 10 in-game cutscenes. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 4.) He holds two federal copyright registrations covering those contributions: U.S. Copyright Registration No. TXu 2-541-660 (source code) and No. PA 2-584-333 (audiovisual works) (collectively, the "Protected Works"). (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 6.)

Defendants recognized the value of Haque's contributions. On November 19, 2024, they granted him a 6% revenue share, which was soon increased to 8%. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 7.) On December 13, 2024, defendants made Haque a co-owner of *Anime Vanguards* and increased his revenue share to 20%, implemented by setting his Roblox group-payout allocation accordingly and designating him "Owner" in the Game's official Discord server. (*Id.*) Under the Roblox payout system, Haque's 20% allocation was mechanically enforced. Roblox earmarked his share of each revenue cycle before distributing the remainder to defendants. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶¶ 11-12.)

In that co-owner role, Haque exercised joint control over game direction, handled operations, payment coordination, hiring, and the execution of updates, and personally wrote and maintained a majority of the Game's code. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 8.) He personally advanced funds to retain counsel for the partnership, signed contracts on its behalf, and bore the costs of forming a corporate entity for the partnership. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 9.) Under his creative leadership, the Game returned to over 100,000 concurrent users and generated over $12 million in revenue during 2025. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 10.)

## II. Defendants coerce Haque to reduce his revenue share and then oust him.

On December 11, 2025, Popov posted a public announcement in the Game's development Discord stating that he would quit *Anime Vanguards* unless Haque reduced his ownership interest from 20% to 10%. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 13; Compl. ¶ 25.) The announcement accused Haque of misconduct and invoked graphic claims of self-harm, including that a prior argument with Haque had caused Popov to "self-harm" and "cut [his] leg deeply." (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 13.) Trapped by those threats, Haque agreed to the reduction in exchange for a promised reduction in his responsibilities. (*Id.*) That promised reduction in responsibilities never occurred, and Haque received no payment or other consideration for surrendering half of his revenue interest. (*Id.*)

On or about January 14, 2026, without any prior notice and without Haque's consent, defendants removed him from the Game's Roblox group, stripped him of all access to the ownership-level Discord channels, eliminated his management role and owner designation, and set his payout allocation to zero. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 14; Compl. ¶ 27.) They provided no explanation and no compensation. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 14.) Popov then falsely represented to developers in the *Anime Vanguards* community that

Haque had failed to perform work for the Game. (*Id.*) Since that date, defendants have continued to operate *Anime Vanguards*, daily reproducing, distributing, and publicly displaying Haque's Protected Works, while paying Haque nothing. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶¶ 15-17.) Defendant Popov has sworn under penalty of perjury that the Game has averaged $511,000 per-month in revenue this year. Declaration of Vladislav Popov in Opposition to Plaintiff's *Ex Parte* Motion for Temporary Restraining Order, Order to Show Cause re: Preliminary Injunction, and Expedited Discovery ("Popov Decl. re: Opp. to Mot. for TRO") (Dkt. 38), ¶ 5.)

Following Haque's removal, he demanded that defendants return the revenue they had intercepted and compensate him for their ongoing use of his Protected Works. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 16.) They refused. (*Id.*)

**III. Plaintiffs filed suit, leading defendants to prioritize short-term profit.**

Plaintiffs filed their original complaint on May 22, 2026. (Compl., Dkt. 1.) After the complaint was filed, defendants made a series of changes to the Game that plaintiffs later identified as a coordinated strategy to extract maximum short-term revenue at the expense of the Game's long-term commercial viability. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶¶ 22-32, 38). On May 31, 2026, defendants distributed large volumes of trait rerolls, one of the Game's primary monetized currencies, to all players for free, rather than selling them through normal monetization channels. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 22.) That same day, defendants removed the visual models for the "vanguard tier" units, the rarest and most coveted content in the Game, alienating the players most likely to spend money. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶¶ 25-26.) Defendants also introduced a pay-to-win progression system called "Memorias," which creates a structural competitive gap between paying and non-paying players that compounds over time. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶¶ 29-30.) Content

creators covering the Game publicly described Memorias as making the Game "considerably more pay-to-win." (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 31.) Members of the ownership team made public statements expressing burnout and a desire to move on from the Game. (Decl. of Brandon Ha in Support of Plaintiffs' *Ex Parte* Motion for Temporary Restraining Order (Ha Decl. re: Mot. for TRO") (Dkt. 28), ¶ 16; Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 35.)

These decisions mirrored a monetization strategy that plaintiff Boss Studio had itself employed and abandoned. Brandon Ha, the Founder and CEO of Boss Studio, attested that during 2025, Boss Studio's game, *Anime Last Stand*, adopted a substantially similar approach of mass distribution of premium in-game currency that produced an initial engagement spike followed by a sharp and permanent collapse in player count and revenue. (Ha Decl. re: Mot. for TRO (Dkt. 28), ¶¶ 7-10.) Ha assessed that *Anime Vanguards* was following the same trajectory, and that a player community driven away by these tactics generally does not return. (Ha Decl. re: Mot. for TRO (Dkt. 28), ¶¶ 12, 18.) Because of these tactics, *Anime Last Stand* now averages less than 1% of its peak concurrent players that it saw during 2025. (Decl. of Brandon Ha in Support of Plaintiffs' Opposition to Defendant Popov's Motion for Sanctions ("Ha Decl."), ¶¶ 3-6.)

*Anime Vanguards*' pre-update player counts, the baseline engagement figure unaffected by temporary spikes around new content releases, had declined noticeably compared to historical levels. (Ha Decl. re: Mot. for TRO (Dkt. 28), ¶ 13.) With each monthly payout cycle, defendants were directing the Game's revenue to their personal Roblox accounts and from there to their foreign accounts, beyond the reach of any eventual judgment. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶¶ 36, 39.)

## IV. The TRO Application and Hearing.

On July 24, 2026, plaintiffs filed an *ex parte* motion for a temporary restraining order seeking to preserve up to $8,150,480 of the Game's revenue in defendants' domestic Roblox accounts, an order to show cause regarding a preliminary injunction, and expedited discovery. (Dkt. 25.) In accordance with Fed. R. Civ. P. 65(b)(1)(B), counsel certified in writing that providing notice of the motion would risk triggering the very transfers the application sought to prevent. (Decl. of Joseph Levy in Support of Plaintiffs' *Ex Parte* Motion for Temporary Restraining Order ("Levy Decl. re: Mot. for TRO") (Dkt. 30), ¶ 3.) Popov's counsel discovered the application two days before the scheduled hearing. (Decl. of Caren Decter in Support of Defendant Vladislav Popov's Motion for Sanctions ("Decter Decl. re: Mot. for Sanctions") (Dkt. 44), ¶ 8.) Popov's counsel filed opposition papers and a supporting declaration on July 29, 2026. (Decter Decl. re: Mot. for Sanctions (Dkt. 44) ¶ 10; Dkt. Nos. 37, 38.)

The Court held a hearing on July 30, 2026. At the hearing, plaintiffs' counsel engaged directly and candidly with the Court's questions about the legal basis for the proposed freeze, the percentage of revenue to which Haque was entitled, and the scope of the proposed order. (Decter Decl. re: Mot. for Sanctions, Ex. A (Dkt. 44-1), Tr. of 7/30/26 at 11:20-12:5, 14:24-15:3, 40:21-41:2016.)[1] Counsel acknowledged that the proposed order could be ambiguous, and clarified that it was intended only to freeze the defendants' Roblox accounts, not any other developer's accounts. (*Id.* at 41:5-21.) To that end, the proposed order specified only those Roblox accounts owned by defendants, not other developers. ([Proposed] Ex Parte Temporary

[1] Defendant Popov filed this transcript publicly, despite the Court's order that the transcript not be publicly released until November 9, 2026, granting the parties until August 31, 2026 to request redactions. (Dkt. 41.) Plaintiffs have no requested redactions, but it is ironic for defendant to argue that plaintiffs engaged in sanctionable conduct by moving *ex parte*, only to then publicly disclose confidential materials without any conferral.

Restraining Order, Order to Show Cause re: Preliminary Injunction, and Expedited Discovery ("[Proposed] Order re: TRO") (Dkt. 27) at 1-2.)

The Court denied the TRO at the close of the hearing. (Order of 7/30/26 (Dkt. 40.))

## LEGAL STANDARD

Section 1927 authorizes an award against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. The Second Circuit imposes a two-part test, in which the challenged claim must (1) lack "a colorable basis," and (2) be brought in "bad faith," such as for purposes of harassment or delay. *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 143-44 (2d Cir. 2012) (quoting *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 336 (2d Cir.1999)). Both findings "must be supported by a high degree of specificity in the factual findings[.]" (*Id.)* (quotations omitted). An unsuccessful or aggressive motion is not, without more, sanctionable. *Schlaifer Nance & Co.,*F.3d at 340 (2d Cir. 1999).

A court's inherent power to award fees similarly requires a finding that the party or its counsel "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)). This bad faith requirement mirrors the bad faith requirement of § 1927. *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986).

## ARGUMENT

### I. The TRO Application was grounded in colorable legal and factual theory.

Plaintiffs' request for a TRO had a reasonable basis in law and fact. "[A] claim is 'entirely without color' when it lacks any legal or factual basis." *Sierra Club v. U.S. Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir. 1985) (quoting *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir.1980)). "Conversely, a claim is colorable 'when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim.'" *Schlaifer*

*Nance & Co.*, 194 F.3d at 337 (quoting *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir.1980) (per curiam)). To determine whether a party had any reasonable legal or factual basis to request certain relief, courts evaluate the request against the governing elements of the relief sought and determine whether the record supplied any legal or factual basis for counsel reasonably to believe the required showing could be made. *See id*. at 337–38 (reversing a sanctions award where sanctioned party demonstrated some reasonable legal or factual basis in support of contested prima facie element of fraud).

### A. Plaintiffs had a colorable basis to support each element of a TRO.

To obtain a temporary restraining order, the moving party must demonstrate: (1) "that he is likely to succeed on the merits"; (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 34 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). Defendant does not establish that plaintiffs lacked a colorable basis on any of these elements.

#### 1. Plaintiffs reasonably argued that they are likely to succeed on the merits.

On likelihood of success, plaintiffs made a colorable showing that they are likely to succeed on their copyright infringement, breach of fiduciary duties, and conversion claims.

##### a. Plaintiffs offered reasonable arguments in support of their copyright claims.

A successful infringement claim requires proving "(1) ownership of a valid copyright and (2) infringement by the defendant." *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 109 (2d Cir. 2001). Plaintiffs met both elements.

First, Haque owns registered copyrights in the source code underlying the Game and the Game's audiovisual works. (U.S. Copyright Reg. PA 2-584-333; U.S. Copyright Reg. TXu 2-541-660). Copyright registration is prima facie evidence of both the validity of the copyright and the facts stated in the registration certificate, 17 U.S.C. § 410(c), and thus this prima facie evidence of valid copyright satisfied the first element of an infringement claim, *see Yurman Design, Inc.,* 262 F.3d at 109.

Second, as Haque attested, "[t]he Game's daily operation necessarily involves the reproduction, public display, public performance, and distribution of the Protected Works—including [his] source code and visual effects—which remain embedded in the Game's architecture." (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 17.) In addition, "[e]ach game update defendants have released since [Haque's] removal has incorporated and built upon the Protected Works." (*Id.*) Defendants are thus infringing Haque's copyrights in violation of 17 U.S.C. §§ 106 and 501. Plaintiffs' argument that they are likely to succeed on the merits has a reasonable basis in law and fact, and defendant's motion for sanctions does not suggest otherwise.

**b. Plaintiffs offered reasonable arguments in support of their fiduciary duty claims.**

Plaintiffs had a colorable basis to assert likelihood of success on their fiduciary duty claim as well. Under New York law, partners owe each other "the duty of the finest loyalty." *Meinhard v. Salmon,* 249 N.Y. 458, 463-64, 164 N.E. 545 (1928). A partnership is created when four conditions exist: "(1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners." *Kidz Cloz, Inc. v. Officially For Kids, Inc.,* 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004)

(citing *North Am. Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.,* No. 99 Civ. 4643, 2000 WL 1290608, *1 (S.D.N.Y Sept. 11, 2000)).

Haque shared profits and losses through his revenue share, exposure to personal liability, and risk of lost funds he personally advanced. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 9.) Haque exercised joint control and management of the Game and was designated an "Owner." (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶¶ 7-8.) Haque personally contributed a majority of the Game's code and personally funded retention of legal counsel to help with the formation of a corporate entity. (*Id.* ¶¶ 8-9.) The fact that Haque was asked to personally sign agreements and corporate documents on behalf of the partnership demonstrates that the parties intended to be partners. (*Id.* ¶¶ 7-9.)

Defendants breached their fiduciary duties to Haque by converting partnership assets, infringing his copyrights, withholding his profits, and engaging in acts of self-dealing. This conduct supports a claim for breach of fiduciary duties. *See Yador v. Mowatt,* No. 19-CV-4128(EK)(RML), 2021 WL 4502442, at *5 (E.D.N.Y. Sept. 30, 2021) (plaintiff stated claim for breach of fiduciary duty when partner converted partnership assets and marketed trademark as his own); *see also Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 307 (2d Cir. 2004) (partners can be separately liable for breach of fiduciary duty for copyright infringement); *Gibbs v. Breed, Abbott*, 271 A.D.2d 180, 190-91, 710 N.Y.S.2d 578 (N.Y. App. Div. 2000) (holding that partners breach their fiduciary duty by taking actions for personal benefit despite causing downstream damage to partnership value).

Accordingly, plaintiffs offered a reasonable basis in law and fact to argue that they are likely to prevail on their breach of fiduciary duty claim. Once again, defendant's motion for sanctions does not suggest otherwise.

**c. Plaintiffs offered reasonable arguments in support of their conversion claims.**

Finally, plaintiffs have a colorable basis for their conversion claim. Under New York law, the "[t]wo key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito v. New York Organ Donor Network, Inc.,* 8 N.Y.3d 43, 50, 860 N.E.2d 713 (2006) (internal citations omitted). Conversion of money gives rise to a claim "where there is an obligation to return or otherwise treat in a particular manner the specific money in question." *Vanderbilt Univ. v. Dipsters Corp.*, No. 84 CIV. 7215-CSH, 1986 WL 10471, at *3 (S.D.N.Y. Sept. 17, 1986). The fact that funds "were not segregated, but instead placed in [a] general account does not mean that those monies are not a 'specific identifiable thing' for purposes of imposing liability for conversion." *LoPresti v. Terwilliger,* 126 F.3d 34, 42 (2d Cir. 1997) (quoting *Vanderbilt Univ.*, 1986 WL 10471, at *3).

Haque has a possessory interest in 20% of the revenue generated by the Game. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶¶ 7, 12.) Roblox's system earmarked Haque's share of Game-generated revenue before defendants could claim it. (*Id.* ¶¶ 12, 18.) As such, the funds are specifically identifiable from the Game's Roblox payout records and segregable as a defined percentage of revenue during discrete periods. (Compl. ¶ 58.) Defendants thus converted these funds when they intentionally diverted them away from Haque, either into accounts belonging to others or to the Game's general fund. *See LoPresti*, 126 F.3d at 42 (company president converted funds when he diverted them from their earmarked purpose to a third-party).

**2. Plaintiffs' theory of irreparable harm is colorable.**

Plaintiffs' claim of irreparable harm was reasonable in light of defendants' recent adoption of a monetization strategy that would "convert[] a recurring revenue source into a one-

time engagement spike followed by a permanent reduction in monetization potential." (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 23). Plaintiffs observed multiple significant gameplay changes that they had seen destroy other games because they "produced an initial surge in player engagement," followed by a loss of "tens of thousands of active players." (Ha Decl. re: Mot. for TRO (Dkt. 28), ¶¶ 8, 10). Their concerns increased when "multiple creators and community members [] publicly expressed concern about the Game's increasing pay-to-win dynamics." (Ha Decl. re: Mot. for TRO (Dkt. 28), ¶ 15; *see also* Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 31.)

Haque and Ha reasonably understood this approach was an "indicator that an operation is in the process of winding down." (Ha Decl. re: Mot. for TRO (Dkt. 28), ¶ 16). This was confirmed by "public statements from members of the *Anime Vanguards* ownership team expressing burnout with the project and a desire to move on from the Game." (Ha Decl. re: Mot. for TRO (Dkt. 28), ¶ 16.) These public remarks came after months of private statements from defendants to the same effect. (*See* Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 33.)

The uncertain future of the Game jeopardized plaintiffs' chances to have their equitable interests vindicated, as defendants live abroad and Haque is unaware of any domestic assets they have besides their Roblox accounts. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 36) Accordingly, the collapse of Game revenue would likely spell doom for any hope of recovery, as all revenue defendants took in would likely be transferred to foreign accounts. (*Id.*) For these reasons, plaintiffs were justifiably concerned that they would be irreparably harmed absent a TRO.

### 3. Plaintiffs' argument regarding the balance of equities and the public interest were objectively reasonable.

Plaintiffs' positions on the balance of equities and the public interest were colorable as well. Defendants' actions to reduce long-term game revenue, coupled with the likely transfer of

funds into foreign accounts, dries up the pool of recoverable funds over which plaintiffs have an equitable interest. (Ha Decl. re: Mot. for TRO (Dkt. 28), ¶¶ 8, 10, 18; Haque Decl. re: Mot. for TRO (Dkt. 29), ¶¶ 23-29.) For their part, the burden on defendants from the requested relief would have been minimal by requiring defendants to preserve a portion of Game revenue in the existing, domestic Roblox accounts for just fourteen days. Additionally, the public interest would be served by the narrow relief plaintiffs sought by preserving this Court's ability to grant the equitable relief plaintiffs ultimately seek, as the public benefits from the enforcement of judgments.

**B. Plaintiffs had a colorable basis to seek a freeze of defendants' assets.**

Contrary to defendants' contention otherwise, an asset freeze was amply supported by caselaw. Courts have the authority to issue a "prejudgment asset freeze . . . where the plaintiff is pursuing a claim for final equitable relief . . . and the preliminary injunction is ancillary to the final relief." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 131 (2d Cir. 2014).

Plaintiffs seek final equitable relief in the form of disgorgement of profits, an accounting, a constructive trust, and for conversion. (Compl. ¶¶ 54, 55, 69, 71.) Courts may freeze assets to preserve equitable remedy of disgorgement. *U.S. Sec. & Exch. Comm'n v. Collector's Coffee Inc.,* 602 F. Supp. 3d 488, 494 (S.D.N.Y. 2022). Courts may also freeze assets in furtherance of an accounting and constructive trust. *Coley v. Vannguard Urb. Improvement Ass'n, Inc.*, No. 12-CV-5565 (PKC) (RER), 2016 WL 7217641, at *3 (E.D.N.Y. Dec. 13, 2016) (an accounting and constructive trust are equitable remedies that support freezing assets). Same with conversion. *Linseth v. Sustayta*, No. 1:21-CV-173, 2022 WL 2829740, at *4 (D.N.D. June 8, 2022); *see also AAAG-California, LLC v. Kisana*, 439 F. Supp. 3d 1265, 1278 (D. Utah 2020) (same).

In support of this equitable interest, plaintiffs requested that the Court freeze up to $8,150,480 within defendants' Roblox accounts. ([Proposed] Order re: TRO (Dkt. 27.) As

plaintiffs' counsel explained at the TRO hearing, the amount was a conservative estimate—based on available data—of the profit that could be disgorged based on revenue projections. ((Decter Decl. re: Mot. for Sanctions, Ex. A (Dkt. 44-1) at 14:24-15:3.) Despite this explanation, defendant falsely states that this figure is "an estimate of what Plaintiffs claimed they might ultimately recover based on Haque's alleged share of Game revenue." (Defendant Vladislav Popov's Memorandum of Law in support of his Motion for Sanctions under 28 U.S.C. § 1927 and the Court's Inherent Powers ("Mem. re: Mot. for Sanctions") (Dkt. 45) at 10.) It is not. Haque's entitlement to 20% of Game revenue has no bearing on this figure.[2]

Defendant also critiques the $8,150,480 figure as lacking "any evidence" to support it, (*Id.* at 5), but this argument is misplaced. Plaintiffs could have sought a freeze of *all* of defendants' assets connected to their equitable claims, which would cover defendants' entire Roblox accounts. *See Gucci Am.*, 768 F.3d at 131. Instead, plaintiffs provided a good faith projection of the potential profits that plaintiffs would be entitled to disgorge in an attempt to cabin the scope of the injunction. To the extent plaintiffs lack a precise figure, that is the purpose of discovery and the accounting remedy they seek.

In sum, plaintiffs made a colorable showing to support their application for a TRO. Because defendant has failed to establish otherwise, the motion for sanctions should be denied.

## II. Plaintiffs were not acting in bad faith.

Plaintiffs were not acting in bad faith when they filed their application. Bad faith may be inferred only where conduct is "so completely without merit as to require the conclusion that it must have been undertaken for some improper purpose." *Enmon*, 675 F.3d at 143 (quoting

[2] Haque's 20% interest is relevant to the conversion claim, which is an equitable interest as well. Thus, even if this figure did tie to the 20% (which it doesn't), it would still be grounded in Haque's equitable interest.

*Schlaifer Nance & Co.*, 194 F.3d at 336). The inference must arise from "explicit and objective evidence"; mere speculation about ulterior motive is not enough. *Schlaifer Nance & Co*, 194 F.3d at 340 (2d Cir. 1999) (reversing § 1927 and inherent-power sanctions; rejecting movant's speculation of improper motive from litigation strategy or economic incentives rather than concrete record evidence).

### A. Plaintiffs were not acting in bad faith by proceeding *ex parte*.

Plaintiffs did not act in bad faith by proceeding *ex parte*. Rule 65(b)(1) permits *ex parte* relief when two conditions are satisfied. First, the moving party must supply "specific facts in an affidavit or a verified complaint [which] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Second, the moving party's attorney must "certif[y] in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(B).

Plaintiffs sought *ex parte* relief because there was a genuine concern that defendants would empty their Roblox accounts if they had notice of the motion. ((Levy Decl. re: Mot. for TRO (Dkt. 30), ¶ 3.) Following the procedures set out by Fed. R. Civ. P. 65(b)(1)(B), plaintiffs' counsel explained that "[p]roviding notice of [the TRO application] would significantly undermine plaintiffs' ability to prevent the harm it seeks to prevent, as notice risks triggering the very transfer or withdrawals plaintiffs are asking the Court to enjoin." (*Id.*)

The facts justify this concern. Earlier this year, defendants unilaterally stripped Haque of his funds, demonstrating a willingness to divert funds without notice. (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶ 14.) After stripping Haque of his funds, defendant Popov falsely told Game developers that Haque had failed to perform work, making clear that defendants were willing to make misrepresentations at Haque's expense. (*Id.*) Then, once Haque was removed, defendants

adopted a monetization strategy that would "convert[] a recurring revenue source into a one-time engagement spike followed by a permanent reduction in monetization potential." (Haque Decl. re: Mot. for TRO (Dkt. 29), ¶¶ 23, 30-31). This risked the long-term success of the Game for a short term profit boost. And, because defendants live abroad, and Haque has no reason to believe that they are preserving funds domestically—meaning that the money likely leaves the country once it transferred out of Roblox. (*Id.* ¶ 36.)

Defendants' willingness to move money around was further confirmed after the TRO was decided, when Haque learned that defendants had to "cut everyone's salary temporarily." (Haque Decl. ¶ 2, Ex 1.)[3] After this, they asked developers to "volunteer giving up [their] salary for the month[.]" (*Id.*) It is unclear what defendants are doing with these salaries when Popov swore under penalty of perjury that the Game was making approximately $511,000 per month. (Popov Decl. re: Opp. to Mot. for TRO (Dkt. 38), ¶ 5.) Like before, plaintiffs have no definitive answer to this question without discovery. But it is far from sanctionable to see smoke and presume fire.

**B. Defendant fails to explain how there was no colorable basis for *ex parte* relief.**

Defendant makes four points in an attempt to demonstrate bad faith, but none come close to "explicit and objective evidence" required to support sanctions. *Schlaifer Nance & Co.*, 194 F.3d at 340.

***First***, defendant cites counsel's admission that plaintiffs do not definitively "know" that defendants' money is being funneled abroad. (Mem. re: Mot. for Sanctions (Dkt. 45) at 4.) This lack of actual knowledge is not proof of bad faith. Though plaintiffs do not have access to

[3] This statement is nonhearsay as it is offered against an opposing party and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D).

defendants' accounts—and thus cannot personally attest to the destination of the funds—there is ample evidence (just discussed) that defendants are moving the Game's dwindling funds to foreign accounts. This is why plaintiffs asked for a 14-day pause on transfers to get expedited discovery on the issue. And, in defendant Popov's declaration opposing the temporary restraining order, he never once denies moving funds into foreign bank accounts. (*See generally* Popov Decl. re: Opp. to Mot. for TRO (Dkt. 38).)

***Second***, defendant argues that Boss Studio's participation in this suit is evidence of bad faith. This contention is nonsensical. Boss Studio has a vested interest in the longevity of *Anime Vanguards* because Boss Studio is entitled to 40% of Haque's revenue share. (Ha Decl. ¶ 3.) This means that Boss Studio financially benefits from the Game's strong performance, and would actively make less money if the Game were to underperform. (*Id.*) Accordingly, Boss Studio does not want to see the Game's revenue negatively impacted. (*Id.*)

Defendant nonetheless points to Boss Studio's involvement with *Anime Last Stand*, a former competitor of *Anime Vanguards*, to suggest bad faith. (Mem. re: Mot. for Sanctions (Dkt. 45) at 4.) But *Anime Last Stand* has been dormant for months, averaging less than 1% of its peak concurrent players during 2025—specifically, because *Anime Last Stand* made similar changes to those defendants have made to the Game. (Ha Decl. re: Mot. for TRO (Dkt. 28), ¶¶ 7-10; Ha Decl. ¶¶ 4-6.) It is not a game Boss Studio expects to produce any substantial revenue. (*Id.* ¶ 7.) Boss Studio stands to make far more money from *Anime Vanguards* prospering, (*id.*), and thus from defendants paying what they owe Haque.

***Third***, defendant claims that the timing of plaintiffs' motion demonstrates bad faith—namely, that plaintiffs sought a restraining order two months after filing the Complaint. But it was by this time that plaintiffs had witnessed the changes defendants made to the Game take

their toll, and came to believe that the Game was at risk of collapse and that there would be nothing to recover at the end of litigation. (Ha Decl. re: Mot. for TRO (Dkt. 28), ¶¶ 8, 10, 18; Haque Decl. re: Mot. for TRO (Dkt. 29), ¶¶ 23-29.) Plaintiffs sought an *ex parte* temporary restraining order pending a preliminary injunction hearing out of genuine concern that defendants would move all their domestic assets abroad with advance notice. (Levy Decl. re: Mot. for TRO (Dkt. 30), ¶ 3.) The goal was to temporarily restrain defendants from emptying what plaintiffs believe to be their only domestic accounts, pending a full hearing on a preliminary injunction. As explained above, there is ample evidence to support plaintiffs' belief that defendants may move their funds abroad with notice—including the fact that defendant Popov has never denied doing so. This was not bad faith conduct.

***Fourth***, defendant relies on *Agee v. Paramount Commc'ns, Inc.*, 869 F. Supp. 209 (S.D.N.Y. 1994), *as amended* (July 27, 1995) and *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138 (2d Cir. 2012) to support its motion. Both cases are inapposite.

In *Agee*, the plaintiff received an *ex parte* TRO to prevent re-broadcast of a particular television episode, but failed to inform the judge that the defendant had already "pledged not to rebroadcast that particular episode." *Agee,* 869 F. Supp. at 211. This was a clear misrepresentation, and when the "deception was discovered," the order was vacated. *Id.* Defendant has not even attempted to argue that plaintiffs or plaintiffs' counsel deceived this Court or made any misrepresentation, and thus *Agee* lends defendant no support. Indeed, in his briefing, defendant consistently relies on the candor of plaintiffs' counsel at the hearing on the temporary restraining order.

Similarly, in *Enmon*, the attorneys falsely stated to the court that the TRO they sought would do nothing but ensure that the action was maintained, when it actually had the effect of

enjoining a related action. *Enmon*, 675 F.3d at 144. In later filing a Rule 60(b) motion, the attorneys falsely represented that evidence was "new," even though they had known about it for over a year. *Id.* at 146. Because of these misrepresentations (and other sanctionable conduct), the Second Circuit affirmed the sanctions order.

Defendant's summary of *Enmon* omits any mention of these misrepresentations that were central to the Second Circuit's decision in *Enmon*. Instead, defendant claims that *Enmon* generally supports sanctions when an "emergency application multiplied proceedings by forcing the opposing party to respond and seek relief," and that the present case "presents the same essential misuse of emergency process[.]" (Mem. re: Mot. for Sanctions (Dkt. 45) at13.) This is a gross mischaracterization of *Enmon*, which has no bearing on the facts of this case. Defendant thus cites no case that supports an award of sanctions here, because no court has awarded sanctions in circumstances like this.

## CONCLUSION

Plaintiffs made a colorable showing on their application for a temporary restraining order. Defendant has no evidence—let alone "explicit and objective evidence"—that would support a finding of bad faith. Instead, defendant appears to be motivated by a continuing desire to take as much money from plaintiffs as he can. Plaintiffs respectfully request that defendant's motion for sanctions be denied.

DATED: August 25, 2026

MARKOWITZ HERBOLD PC

*/s/ Joseph M. Levy*

Joseph M. Levy, *admitted pro hac vice*
JosephLevy@MarkowitzHerbold.com
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085

Harry B. Wilson, NY # 5864483
HarryWilson@MarkowitzHerbold.com
603 3rd Avenue, Floor 16
New York, NY 10158
Telephone: (212) 909-2610
*Attorneys for Plaintiff Boss Studio LLC*

PERAINO MALINOWSKI LLP

*/s/ David M. Peraino*
David M. Peraino
DPeraino@PMLaw.nyc
152 Madison Avenue, 16th Floor
New York, NY 10016
Telephone: (646) 930-8602
*Attorneys for Plaintiff Rehaab Haque*

**CERTIFICATE OF COMPLIANCE WITH L.R. 7.1(c)**

I certify that this brief complies with the applicable word-count limitation under L.R. 7.1(c) because it contains 6,008 words, including headings, footnotes, and quotations, but excluding the caption, any index, table of contents, table of authorities, signature blocks, and any required certificates.

DATED: August 25, 2026

*/s/ Joseph M. Levy*
Joseph M. Levy, *admitted pro hac vice*
*Attorneys for Plaintiff Boss Studio LLC*